

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-15-2008

# Phila Marine v. Comm IRS

Precedential or Non-Precedential: Precedential

Docket No. 06-3798

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Phila Marine v. Comm IRS" (2008). *2008 Decisions*. Paper 1292.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1292

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-3798

PHILADELPHIA MARINE TRADE ASSOCIATION-
INTERNATIONAL LONGSHOREMEN'S ASSOCIATION
PENSION FUND; O'NEILL CONSULTING
CORPORATION,

Appellants

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE;
UNITED STATES OF AMERICA

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 04-cv-04857)
District Judge: Honorable Gene E.K. Pratter

Argued September 26, 2007

Before: AMBRO, JORDAN and ROTH, <u>Circuit Judges</u>

(Opinion filed: April 15, 2008)

Vincent J. Pentima, Esquire (Argued)
Jessamyne M. Simon, Esquire
Alfred J. D'Angelo, Jr., Esquire
Joseph P. Sirbak, II, Esquire
Buchanan, Ingersoll & Rooney
1835 Market Street, 14th Floor
Philadelphia, PA   19103

       Counsel for Appellant

Eileen J. O'Connor
   Assistant Attorney General
Robert W. Metzler, Esquire
Kenneth W. Rosenberg, Esquire
Teresa T. Milton, Esquire
Kenneth L. Greene, Esquire (Argued)
United States Department of Justice
Tax Division
P.O. Box 502
Washington, DC   20044

       Counsel for Appellee

_____

OPINION OF THE COURT

_____

AMBRO, Circuit Judge

     In this tax case the Internal Revenue Service imposed a tax penalty and collected it by a levy on assets. The trust fund (against whose assets the IRS levied to collect the penalty) and the fund's administrator (who reimbursed the fund on the penalty it paid) seek the return of the monies paid. The IRS resists on two grounds that are pertinent to this appeal. It argues that the fund's administrator lacks standing to sue the United States for a refund under 28 U.S.C. § 1346(a)(1), where the penalty was actually assessed against the fund itself but the administrator reimbursed the fund. We conclude that the IRS is correct on this issue, and the administrator lacks standing.

     But that does not end the matter. The taxpayer (the fund) may still sue. The IRS claims, however, the tax refund request was untimely. The fund counters that it produced evidence that it mailed the request early enough to allow timely physical delivery. This method, known as the common-law mailbox rule, works if the rule still exists. The Government argues it does not because 26 U.S.C. § 7502 preempts the common-law mailbox rule in tax cases. We disagree; the mailbox rule simply supplements § 7502. In addition, even before any consideration of the mailbox rule, there is sufficient direct evidence of timely receipt to preclude summary judgment against the fund. Thus, we vacate the District Court's order to the extent it concluded the contrary.

## I.  Facts and Procedural History

The Philadelphia Marine Trade Association/International Longshoremen's Association Vacation Fund (the "Fund") is a multi-employer trust fund that accumulates contributions from collective bargaining agreements between the Philadelphia Marine Trade Association and local unions of the International Longshoremen's Association.  The Fund is required to withhold income and payroll taxes from the money it distributes and to remit these taxes to the IRS.  Accordingly, it hired O'Neill Consulting Corporation ("O'Neill"), a family-owned consulting business, as the Fund's administrator to handle the task of calculating and remitting the taxes.

Prior to June 25, 2001, the IRS determined that the Fund had remitted its taxes for the fourth quarter of 1999 and the second quarter of 2000 by a paper coupon, rather than electronically, in violation of applicable regulations.  It also apparently determined that the Fund had remitted its taxes for the fourth quarter of 2000 late, though it did so electronically. The IRS thus assessed penalties against the Fund and notified O'Neill of the problems.  The O'Neill employee who received the communications from the IRS, however, failed to take corrective action. Accordingly, on June 25, 2001, the IRS levied on $160,386.48 held by the Fund in a money market account. The O'Neill employee who had failed to respond to the IRS then resigned in February 2003 without having disclosed the existence of the levy to O'Neill or the Fund.  It was not until the

4

spring of 2003 that the Fund and O'Neill discovered the levy as a result of an audit on the Fund's books performed by Anthony Pontarelli, CPA.

Alarmed, Pontarelli and Susan O'Neill[1] (O'Neill's president) called Revenue Officer James Dugan of the IRS to ask for an explanation of the levy. Dugan testified that because the tax penalty was paid, and the case therefore closed from the IRS's standpoint, he did not keep records of this communication. He also testified, however, that during this conversation Pontarelli and Ms. O'Neill were "frantic," "in an uproar," and "so nervous and concerned." Subsequently, the Fund and O'Neill assert, Pontarelli drafted a letter to Dugan on or before May 8, 2003 requesting a refund (the "May 8 Letter"). Pontarelli testified that he faxed the May 8 Letter to Ms. O'Neill, and she testified that she received it, immediately signed it, and sent it via United States Postal Service overnight mail to Dugan. Ms. O'Neill cannot provide proof of mailing the May 8 Letter, and there is no separate billing record to support this assertion because the postage was paid through a meter at O'Neill's office. Dugan claimed he could not recall whether he received the letter.

Ms. O'Neill contends that, having not yet heard a response from Dugan to the May 8 Letter, she called him in late

_____

[1] We will refer to her as "Ms. O'Neill" to distinguish her from the consulting company.

5

May. She asserts that Dugan informed her that he had not yet had a chance to review the matter but would let her know when he had done so. Ms. O'Neill alleges that she then sent another letter to Dugan on June 13, 2003 (the "June 13 Letter"), with postage again prepaid through a meter in O'Neill's office, this time by first class mail. Although Dugan again does not recall receiving the letter, a computer printout shows that the June 13 Letter was in fact composed by Ms. O'Neill on that date.

Pontarelli testified that Dugan subsequently left him two voicemail messages in late June 2003. The first assured him that Dugan would process a refund for the Fund. The second backed off from this assurance, noting that the matter was more complicated than Dugan had anticipated.

In August 2003, following various communications over the summer, Pontarelli, Thomas McGoldrick (O'Neill's attorney), Dugan, and Allison Sigler (a "trouble shooter" for the IRS) met to discuss the matter. Dugan and Sigler declined to refund the money at this meeting, but told Pontarelli and McGoldrick how they could formally request a refund. Accordingly, in September 2003 McGoldrick, on behalf of the Fund, filed a formal refund request via IRS Form 843 and a nine-page letter. The IRS then granted a partial refund of $93,365.61, corresponding to the second and fourth quarters of

2000,[2] but withheld the portion corresponding to the fourth quarter of 1999. According to the IRS, because the penalty for this quarter was paid on June 25, 2001, under 26 U.S.C. § 6511(a) the Fund had to request a refund by June 25, 2003. The September 2003 refund request, the IRS asserted, was therefore untimely.

Recognizing that its employee was partly to blame for the Fund's predicament (having failed timely to respond to the IRS's pre-levy communications), O'Neill reimbursed the Fund for the tax penalty. It did so via a formal agreement in which the Fund, in exchange for reimbursement, promised to cooperate with O'Neill in processing its appeal to the IRS for a refund and to transfer to O'Neill any money recovered from the IRS.

The Fund and O'Neill filed suit in the United States District Court for the Eastern District of Pennsylvania to recover payment of the remaining penalty. They, as well as the Government, later moved for summary judgment. In support of its motion, the Government argued that the District Court lacked jurisdiction over O'Neill's claim, as O'Neill lacked standing under 28 U.S.C. § 1346(a)(1). The Government also argued that the Court lacked jurisdiction over both plaintiffs' claims due to untimely filing of the refund request, because the plaintiffs did

---

[2] The Government has brought suit to recover this partial refund. The suit is pending in the United States District Court for the Eastern District of Pennsylvania.

7

not produce direct evidence of timely receipt by the IRS and could not avail themselves of the common-law mailbox rule, which the Government contended was preempted by 26 U.S.C. § 7502. The District Court agreed and granted summary judgment in the Government's favor (thus denying the summary judgment motion of the Fund and O'Neill). The Fund and O'Neill timely appealed, and we exercise appellate review pursuant to 28 U.S.C. § 1291.

## II. Standard of Review

Because the District Court granted summary judgment, our review is plenary. *See, e.g.*, *Bailey v. United Airlines*, 279 F.3d 194, 198 (3d Cir. 2002). Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We must draw all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party. *Bailey*, 279 F.3d at 198.

## III. O'Neill's Standing

The District Court properly concluded that O'Neill lacks standing to sue the Government for a refund. First, 28 U.S.C. § 1346(a)(1) has conferred no right on O'Neill to sue for a refund; it has conferred that right only on the taxpayer—the Fund. Second, O'Neill does not qualify for third-party standing to assert the Fund's right.

**A. O'Neill's Lack of Statutory Standing Under 28 U.S.C. § 1346(a)(1)**

Statutory standing asks "whether Congress has accorded *this* injured plaintiff the right to sue the defendant to redress his injury." *Graden v. Conexant Sys., Inc.*, 496 F.3d 291, 295 (3d Cir. 2007) (emphasis in original). The statute at issue here is 28 U.S.C. § 1346(a)(1), by which the United States has waived sovereign immunity. It confers original jurisdiction on the district courts for civil actions against the United States for the recovery of allegedly erroneous or illegal tax assessments or collections. *See United States v. Dalm*, 494 U.S. 596, 601–02 (1990).[3]

The Supreme Court in *United States v. Williams* has cautioned that we must not enlarge this waiver beyond the purview of the statutory language, and that we must construe ambiguities in favor of immunity. 514 U.S. 527, 531 (1995). The Court held that § 1346(a)(1) authorizes a refund suit not only by a party directly assessed a tax, but also "a party who,

---

[3] Specifically, the statute confers original jurisdiction on the federal district courts for "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws." § 1346(a)(1).

though not assessed a tax, paid the tax under protest to remove a federal tax lien from her property." *Id.* The Government had filed a lien against the plaintiff's house because the plaintiff's ex-husband was delinquent on his taxes. *Id.* at 529–30. The plaintiff, protesting the lien because she herself was not delinquent on her taxes, nonetheless paid the Government to clear title to the house because she had contracted to sell it. *Id.* at 530. The Court held that the plaintiff had standing to sue the Government for a refund under § 1346(a)(1), reasoning that the lien was against the plaintiff's own property, *id.* at 539; that the plaintiff paid the Government under protest (*i.e.*, she had insisted that her property was not a proper source from which to extract money to satisfy her ex-husband's tax liability), *id.* at 540; and that no other available remedy existed, *id.* at 536–38.

But the Court essentially limited its holding in *Williams* to the case's facts. It clarified, for instance, that it did not "decide the circumstances, if any, under which a party who volunteers to pay a tax assessed against someone else may seek a refund under § 1346(a)." *Id.* at 540. Recognizing the narrowness of this holding, the Tenth Circuit Court of Appeals held in *Dahn v. United States* that a plaintiff lacked standing to challenge the Government's seizure of his property to satisfy his parents' debts. 127 F.3d 1249, 1251, 1254 (10th Cir. 1997). The Court reasoned that, whereas the plaintiff in *Williams* "deliberately and affirmatively proffer[ed] payment" to the Government, the plaintiff in *Dahn* was "simply a passive, collateral subject of IRS collection activities." *Id.* at 1254.

10

We conclude that § 1346(a)(1), as interpreted by the Supreme Court in *Williams*, does not give O'Neill a right to sue. It was not assessed the tax penalty. Moreover, O'Neill's involvement in the tax-penalty payment differs from that of the plaintiff in *Williams*. Unlike that person's property, O'Neill's own property was not encumbered by the Government. More importantly, O'Neill did not pay the tax penalty to the IRS. Rather, the Fund paid the IRS, and O'Neill merely decided to reimburse the Fund. Although O'Neill claims its reimbursement of the Fund was "involuntary" because O'Neill was partly at fault for the levy, and consequently the Fund would have sued O'Neill had it not made the Fund whole, *Williams* focused on whether the plaintiff's payment *to the Government* was voluntary. Given that we are required to construe ambiguities in favor of sovereign immunity, *Williams*, 514 U.S. at 531, we deem these distinctions fatal to O'Neill's statutory standing.

## B.    O'Neill Cannot Assert the Fund's Rights

Even where a party satisfies the constitutional standing requirements of injury, causation and redressability, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), other (called prudential) considerations generally bar that party from asserting the legal rights of others, *see Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004). The Supreme Court has created an exception, however, allowing third-party standing where "the party asserting the right has a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to

the possessor's ability to protect his own interests." *Id.* at 130.

Invoking this exception, O'Neill argues that even if the Fund technically possesses the right to sue for a refund under § 1346(a)(1), O'Neill may nevertheless assert that right as well. It reasons there is a "hindrance" to the Fund's ability to assert its own rights because, having already been made whole by O'Neill, the Fund lacks incentive to pursue a refund. Fund's & O'Neill's Reply Br. at 3–5.

We find this argument unpersuasive. Even if O'Neill enjoys a "close" relationship with the Fund, there is not a hindrance to the Fund's ability to sue for a refund. In different circumstances, a rightholder's lack of incentive to sue could suggest there is a hindrance. For instance, in *Powers v. Ohio*, the Supreme Court cited jurors' lack of financial incentive to sue as one of several reasons for allowing litigants to challenge improper exclusion of jurors during *voir dire*. 499 U.S. 400, 415 (1991). Similarly, in *Pennsylvania Psychiatric Society v. Green Spring Health Services, Inc.*, our Court held that psychiatrists had third-party standing to bring their mental health patients' claims against managed health care organizations for impairing the patients' treatment. 280 F.3d 278, 290–91 (3d Cir. 2002). We reasoned that the patients were unlikely to sue in part because they feared that doing so would cause a stigma, creating a "considerable deterrent" to litigation. *Id.*

Here, however, the Fund is not only willing to sue on its

12

own behalf—it *has* sued. Moreover, we have no evidence that the Fund would drop its suit were we to dismiss O'Neill as a plaintiff. Also, we are not aware of any case holding that a person or entity such as O'Neill may "purchase" third-party standing by paying the rightholder the amount of the rightholder's loss (thus stripping the rightholder of its incentive to sue) and then suing the wrongdoer for reimbursement. Cases instead have focused on whether the rightholder's lack of incentive, *before* intervention by the party asserting the right, tends to deter the rightholder from bringing suit. *See, e.g.*, *Carey v. Population Servs. Int'l*, 431 U.S. 678, 684 n.4 (1977) (vendor could challenge law prohibiting distribution of contraceptives in part because the desire to avoid publicity would deter potential purchasers from defending their own rights). Here, by contrast, the Fund did not lack incentive to sue for a refund at the time the IRS levied on its property; the Fund had every reason to, and did, seek a refund. If the Fund has lost incentive to sue, it is because O'Neill stripped the Fund of that incentive by deciding to reimburse it.

In short, the Fund did not need a third party to protect its rights. Consequently, we cannot agree that O'Neill fits within the third-party standing exception. We therefore affirm the District Court's order to the extent that it denied standing to O'Neill.

13

## IV. Timely Filing

### A. Timely Filing as a Prerequisite to Federal Jurisdiction

It is undisputed that the District Court had jurisdiction to hear this suit only if the Fund filed its refund claim by June 25, 2003. To repeat, by 28 U.S.C. § 1346(a)(1) Congress conferred original jurisdiction on federal district courts for civil actions against the United States for the recovery of allegedly erroneous or illegal tax assessments or collections. *See Dalm*, 494 U.S. at 601–02. It limited this conferring of jurisdiction, however, to suits that follow a "duly filed" claim for refund or credit. 26 U.S.C. § 7422(a). A claim is "duly filed" when it is timely. *Dalm*, 494 U.S. at 602.

26 U.S.C. § 6511 governs whether a refund request is timely. *Comm'r of Internal Revenue v. Lundy*, 516 U.S. 235, 239 (1996). Subsection 6511(a) states that a

> [c]laim for credit or refund of an overpayment of any tax imposed by this title in respect of which tax the taxpayer is required to file a return shall be filed by the taxpayer within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later, or if no return was filed by the taxpayer, within 2 years from the time the tax was paid.

14

26 U.S.C. § 6511(a).  The return for the fourth quarter of 1999 (the quarter for which the Fund seeks a refund) was filed on January 31, 2000, and the IRS levied on the Fund's assets on June 25, 2001.  Using the later-expiring deadline of two years after the levy, § 6511(a) required the Fund to file its refund request by June 25, 2003.  Doing so is a prerequisite to federal jurisdiction.[4]

## B. Summary Judgment on the Issue of Timely Filing Was Improper

The District Court erred in granting summary judgment to the Government on the issue of timely filing.  As an initial matter, there is enough direct evidence of pre-June 25, 2003 receipt of the refund requests in the record to raise a genuine issue of material fact.  Moreover, the common-law mailbox rule remains a way for taxpayers such as the Fund to prove receipt indirectly by proof of mailing, notwithstanding the enactment of 26 U.S.C. § 7502.

### 1. Direct Evidence of Receipt

Aside from any consideration of the mailbox rule's continued existence, we believe that there is enough direct

---

[4] The Government does not contest the District Court's conclusion that the May 8 and June 13 Letters, if timely received, suffice as refund requests.

evidence of pre-June 25, 2003 receipt by the IRS of the refund requests (per the May 8 and June 13 Letters) to preclude summary judgment for the Government. Drawing reasonable inferences in the Fund's favor (as we must), we are satisfied that a reasonable fact-finder could find that the IRS timely received the Fund's refund requests.

Pontarelli testified that he received a phone message from Revenue Officer Dugan acknowledging receipt of the May 8 Letter. Dugan's testimony about this is inconclusive. Though he did not recall receiving the letter, he admitted it was possible that he did. And given Dugan's statement that he would have ultimately destroyed the file containing the May 8 and June 13 Letters if he had received them, the Government's assertion that it has no record of the letters does not resolve the question whether it received them. Finally, the IRS's actions after June 2003, in particular its meeting with the Fund's representatives in August 2003, suggest that there was a precipitating event—perhaps receipt of a refund request—that triggered this governmental response.

## 2. The Mailbox Rule

Even if we had concluded that the Fund's direct evidence of receipt is insufficient to preclude summary judgment, it has an alternate method for showing receipt: the common-law

16

mailbox rule.[5]  Two of our sister Circuit Courts—the Second and Sixth—have held that the common-law mailbox rule has been preempted by 26 U.S.C. § 7502.  We disagree. Specifically, we hold that, where a taxpayer does not rely on § 7502's protection and produces evidence beyond its own testimony that it mailed the tax document early enough to allow timely receipt by the IRS in the regular course of United States Post Office business, it may avail itself of the mailbox rule.[6] Accordingly, we vacate the District Court's order to the extent it concluded to the contrary.

### a.	Development of the Mailbox Rule

A statutory filing requirement generally can be satisfied only by actual, physical delivery to the Government.  *United States v. Lombardo*, 241 U.S. 73, 76, 78 (1916); *Heard v. Comm'r of Internal Revenue,* 269 F.2d 911, 913 (3d Cir. 1959).

---

[5] We note that this portion of the opinion is an alternative holding, not a *dictum*: "where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum." *Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949).

[6] We need not, and do not, decide whether a plaintiff seeking § 7502's protection may avail itself of the mailbox rule, nor whether a plaintiff whose evidence of mailing consists entirely of the plaintiff's own testimony may put in play the presumption provided by the mailbox rule, because this case does not present either set of facts.

17

This has come to be known as the "physical delivery rule."  To help determine when the pertinent document was physically delivered, courts developed the common-law mailbox rule.  If a document is properly mailed, the court will presume the United States Postal Service delivered the document to the addressee in the usual time. *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884); *see also Hagner v. United States*, 285 U.S. 427, 430 (1932).  The Government then has the opportunity to rebut this presumption with evidence of untimely receipt.  *See Hagner*, 285 U.S. at 430.

In this context, the mailbox rule is merely a method for determining the date of physical delivery under the "physical delivery" rule.  It does not ignore the physical delivery requirement, but merely creates a presumption that physical delivery occurred in the ordinary time after mailing.

### b.      26 U.S.C. § 7502

In 1954, Congress enacted § 7502 of the Internal Revenue Code.  The current version provides in relevant part:

> **§ 7502. Timely mailing treated as timely filing and paying**
> **(a) General rule. (1) Date of delivery.** If any return, claim, statement, or other document required to be filed, or any payment required to be made, within a prescribed period or on or before

18

a prescribed date under authority of any provision of the internal revenue laws is, after such period or such date, delivered by United States mail to the agency, officer, or office with which such return, claim, statement, or other document is required to be filed, or to which such payment is required to be made, the date of the United States postmark stamped on the cover in which such return, claim, statement, or other document, or payment, is mailed shall be deemed to be the date of delivery or the date of payment, as the case may be.

. . . .

**(c) Registered and certified mailing; electronic filing. (1) Registered mail.** For purposes of this section, if any return, claim, statement, or other document, or payment, is sent by United States registered mail—

> (A) such registration shall be prima facie evidence that the return, claim, statement, or other document was delivered to the agency, officer, or office to which addressed; and

> (B) the date of registration shall be deemed the postmark date.

19

**(2) Certified mail; electronic filing.** The Secretary is authorized to provide by regulations the extent to which the provisions of paragraph (1) with respect to prima facie evidence of delivery and the postmark date shall apply to certified mail and electronic filing.

26 U.S.C. § 7502.

Subsection 7502(a)(1) relieves a taxpayer from the "timely physical delivery" requirement where it postmarks the document before the filing deadline but the Government actually receives the document after the deadline. The "postmark" date effectively becomes the "delivery" date.

Subsection (c)(1) provides, for purposes of § 7502, that registering one's mail with the Postal Service establishes a *prima facie* case of delivery and that the registration date shall be the "postmark" date (which, due to § 7502(a), is also the "delivery" date). Subsection (c)(2), and 26 C.F.R. § 301.7502-1(c)(2), (d) & (e) promulgated thereunder, extend this safe harbor to certified and electronic mail.

**c.    The  Continuing Effect of the Mailbox Rule**

After the enactment of § 7502, there are at least two types

of the common-law "mailbox rule" that a taxpayer might seek to invoke, only one of which we deal with here. First, a taxpayer relying on § 7502—because it mailed the document before the deadline, but too late for that document to arrive on time in the ordinary course of post office business—might seek to invoke a presumption of eventual delivery. It would need this presumption because § 7502(a)(1) protects the taxpayer only where the IRS actually receives the document at some later time. *See Sorrentino v. IRS*, 383 F.3d 1187, 1191 n.5 (10th Cir. 2004). If the taxpayer sends the document by registered, certified, or electronic mail, § 7502(c) affords it a presumption of receipt. If, however, it does not use one of these three methods, and then faces an IRS allegation of nonreceipt, the taxpayer must ask the court to recognize an additional presumption of receipt not listed in the statute—one arising from proof of mere mailing or postmark. Such a taxpayer would have to argue that the circumstances giving rise to a *prima facie* case of delivery that are listed in § 7502(c) are not exclusive. Several of our sister Circuit Courts have accepted this argument, at least where the taxpayer introduced circumstantial evidence of postmark beyond its own testimony. *See id.* at 1194–95; *Anderson v. United States*, 966 F.2d 487, 491 (9th Cir. 1992); *Estate of Wood v. Comm'r of Internal Revenue*, 909 F.2d 1155, 1159–61 (8th Cir. 1990).[7]

---

[7] In *Estate of Wood*, the Eighth Circuit Court held that a taxpayer relying on § 7502(a)(1) enjoys a presumption of delivery upon proof of postmark (at least, it seems, where the

evidence goes beyond the taxpayer's own, self-serving testimony), notwithstanding that § 7502(c) gives other circumstances in which a taxpayer enjoys the presumption. 909 F.2d at 1159–61. The Ninth Circuit followed the Eighth Circuit's lead in *Anderson*, 966 F.2d at 491. So did the Tenth Circuit, with the explicit caveat that the taxpayer must produce circumstantial evidence beyond the taxpayer's own testimony. *Sorrentino*, 383 F.3d at 1194–95.

The Ninth and Tenth Circuits' decisions may very well also afford a presumption of receipt to taxpayers not relying on § 7502's protection. The taxpayers in *Sorrentino* seemingly did not need § 7502's protection (only the common-law mailbox rule) because they claimed to have mailed their document with plenty of time for it actually to have arrived before the deadline, and the Court ultimately concluded the taxpayers' own testimony was insufficient "to raise a presumption the IRS received" the document "prior to" a date well after the deadline. *See id.* at 1188, 1195. Similarly, the taxpayers in the Ninth Circuit's *Anderson* decision did not need § 7502*, see* 966 F.2d at 488, and the Court noted that "even if section 7502(c) is the only exception to the statutory mailbox rule requiring proof of mailing by postmark, it does not follow that the statutory mailbox rule announced in section 7502 is the exclusive means of proving timely mailing and filing," *id.* at 490.

In any case, we need not dwell on the precise reach of these cases. As we explain below, § 7502's text, history and purpose direct us to uphold the common-law mailbox rule for taxpayers who do not rely on § 7502's protection and introduce evidence of mailing beyond their own testimony.

22

here. Instead, we have a second, more classic mailbox rule—a taxpayer who allegedly mailed its refund requests with time (here, plenty of time) for them to arrive *before* the deadline. Such a taxpayer does not need the protection of § 7502, as the statute's function is to excuse taxpayers for *late* receipt. The Fund does not ask us to specify either May 8, 2003 or June 13, 2003 (the dates it allegedly mailed its refund requests) as the date of filing. It only asks for a presumption of delivery of the letters in the ordinary time after mailing (here, one day after May 8 or the regular first class delivery time after June 13, as O'Neill allegedly sent the letters via overnight and first class mail, respectively), which would be well before the June 25 deadline. Accordingly, the dispute here is whether § 7502 has completely supplanted the common-law mailbox rule in tax cases where the taxpayer does not even rely on the statute.

For starters, the text of § 7502 does nothing to affect the mailbox rule in cases such as the one before us. "It is a well-established principle of statutory construction that the common law ought not to be deemed repealed, unless the language of a statute be clear and explicit for this purpose." *Norfolk Redevelopment & Housing Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 35 (1983) (internal quotations, brackets, and ellipses omitted). By its terms, § 7502(a) applies only to cases where the pertinent document was delivered to the Government after the filing deadline. Here, by contrast, neither party claims the refund requests were delivered after the filing deadline of June 25, 2003. To repeat, the Fund produced evidence that

23

O'Neill sent the May 8 and June 13 letters by overnight and first class mail, respectively. If that is true, the letters would presumably have arrived well before the June 25 deadline. The Government, meanwhile, claims it has no record of having received the letters at all. The text of § 7502(a), therefore, does not direct a result here. Thus § 7502(c), which limits its application to cases in which § 7502 generally applies, *see* § 7502(c)(1) ("*For purposes of this section*, if any return, claim, statement, or other document, or payment, is sent by United States registered mail . . . .") (emphasis added), is also inapplicable.

Even looking beyond the text, we see no indication that Congress intended to preempt the mailbox rule for taxpayers who do not seek § 7502's protection. As an initial matter, we find nothing in the legislative history of § 7502 to support the preemption argument.[8] Moreover, as a matter of logic, it is

---

[8] If anything, one portion of the legislative history suggests that Congress did not intend § 7502's provisions to preclude other evidence of mailing. In the legislative history relating to a 1968 amendment covering mailed tax deposits, Senate and House Reports state that although the date of mailing can be proven by the date of registration for registered mail, "[t]he taxpayer, of course, could also establish the date of mailing by other competent evidence." S. Rep. No. 90-9014 (1968), 1968 U.S.C.C.A.N. 2354, 2373; H.R. Rep. No. 90-1104 (1968), 1968 U.S.C.C.A.N. 2341, 2354. Although this language is not directly on point, as it explicitly speaks only to § 7502(e) rather

difficult to imagine that Congress, by passing a law that was designed to *protect* taxpayers who meet § 7502's requirements, would (without so stating) simultaneously seek to *roll back the protections* for taxpayers that already exist at common law. Congress's intent, we believe, was to supplement, not supplant, means by which taxpayers can timely file documents with the IRS. *See Estate of Wood*, 909 F.2d at 1161.

The Government draws our attention to *Boccuto v. Commissioner of Internal Revenue*, 277 F.2d 549, 553 (3d Cir. 1960), where we decided that the taxpayers in that case could not satisfy § 7502. It argues that in that case we "recognized that[,] after the enactment of § 7502, evidence of mailing other than that provided in that statute is no longer sufficient to establish timely filing." Government's Br. at 34.

Unlike the current case, however, *Boccuto* involved a straightforward application of § 7502 to taxpayers who had no choice but to rely on the provision. The taxpayers there delivered the document to the post office on the due date, the document was postmarked one day after the due date, and the tax authorities received the document the day after that. *Boccuto*, 277 F.2d at 551. The ordinary time after mailing

_____

than the subsections of § 7502 at issue here, it lends support to the notion that Congress did not intend courts to prevent evidence of mailing where the statute itself does not direct that result.

25

would have been too late. Thus, the taxpayers needed to transform the date of mailing into the date of delivery—something only § 7502 could accomplish. We denied the taxpayers use of § 7502 because we concluded that the date of postmark, not the date of mailing, controlled under that statute. *Id.* at 553.[9] Here, by contrast, the Fund neither needs nor seeks § 7502's protection.

The Government makes too much of our statements in *Boccuto* that "Congress has explicitly set forth the allowable exceptions to the rule of actual receipt by the Tax Court within the specified time," and that "[u]nless a taxpayer can fit himself within one of the statutory exceptions, he is bound by this rule." *Id.* The Government treats the mailbox rule as an exception to the physical delivery rule which, because that exception is not enumerated in § 7502, it argues must be preempted under this language in *Boccuto*.

We are not persuaded by this argument, as *Boccuto* does not affect our case. Not only did it not concern the common-law mailbox rule, but we also do not think the mailbox rule we deal

---

[9] The taxpayer produced a certified mail receipt showing the date of mailing, but we rejected the taxpayer's attempt to transform the date on the receipt into the date of filing because the regulations implementing § 7502(c)'s extension of § 7502 to certified mail had not been promulgated until well after the taxpayer mailed the document. *Id.* at 552–53.

with here should be seen as an exception to the "rule of actual receipt . . . within the specified time." Unlike § 7502, the mailbox rule invoked by the Fund in this case does not excuse untimely delivery; it is simply a method for determining when, under the physical delivery rule, a document is physically delivered. *See Hagner*, 285 U.S. at 430; *In re Nimz Transp. Inc.*, 505 F.2d 177, 179 (7th Cir. 1974). The Government is free to produce evidence that the document failed to arrive on time. If it does so convincingly, the taxpayer's claim to timeliness under the common-law mailbox rule will fail. Section 7502, by contrast, allows a taxpayer to establish timeliness even where it is conclusively shown that the document arrived after the deadline. Thus, *Boccuto* spoke to the degree to which § 7502 confers benefits on taxpayers *beyond* what the common law provided. In that instance, it was simply cautious not to overread the extent of Congress's generosity. Here, by contrast, we address the degree to which *existing* common-law protections remain intact.[10]

The Second and Sixth Circuit Courts, contrary to what we decide today, have seemingly concluded that § 7502 preempts the common-law mailbox rule even where the taxpayer does not need § 7502's protection. In *Deutsch v. Commissioner of*

---

[10] The parties dispute whether the conclusion in *Boccuto* constitutes its holding or, as the District Court interpreted it, a *dictum*. Because the issue in *Boccuto* differs from the issue we deal with here, we need not resolve this dispute.

27

*Internal Revenue*, the Second Circuit invoked § 7502 to prevent a taxpayer from proving, other than by production of a postmark or registration receipt, that he mailed the document on August 4, 1977, well before a September 27, 1977 deadline. 599 F.2d 44, 44–46 (2d Cir. 1979).[11] It reasoned that § 7502 demonstrates a "penchant for an easily applied, objective standard." *Id*. at 46. The Sixth Circuit in *Miller v. United States* joined the Second Circuit's reading of § 7502 and rejected application of the common-law mailbox rule. 784 F.2d 728, 730–31 (6th Cir. 1986) (*per curiam*). In that case, the IRS's records established that no claim for refund was ever received, but the taxpayer offered proof of proper mailing well within the statutory period. *Id.* Rejecting this evidence, the Court concluded that "the only exceptions to the physical delivery rule available to taxpayers are the two set out in section 7502." *Id.* at 731.[12]

We decline to follow these decisions. The Second Circuit's reasoning in *Deutsch*—essentially that Congress's

---

[11] The Court reaffirmed its holding in *Deutsch* in *Washton v. United States*, 13 F.3d 49, 49–50 (2d Cir. 1993) (rejecting evidence that the taxpayers mailed their documents well before the filing deadline).

[12] The Sixth Circuit has continued to apply this rule in various cases such as *Carroll v. Commissioner*, 71 F.3d 1228, 1230–31 (6th Cir. 1995) (rejecting "unimpeachable proof of mailing" 54 days before the filing deadline).

desire was to create an easily applied and objective standard—is insufficient under the well-established principle that Congress must clearly indicate its intent to repeal a common-law rule. *See Norfolk Redevelopment*, 464 U.S. at 35. Even assuming the common-law mailbox rule is neither easily applied nor objective, an assumption about which we are skeptical, that alone is insufficient. It does not clearly follow from Congress's enactment of an additional taxpayer protection with easily applied standards that it sought simultaneously to repeal an existing common-law protection with less easily applied standards.

The Sixth Circuit in *Miller* appears to have treated the mailbox rule as an "exception" to the physical delivery rule. Because Congress did not list the mailbox rule in § 7502 along with other exceptions to the physical delivery rule, the Court reasoned, it must have intended to exclude the mailbox rule. *See Miller*, 784 F.2d at 730–31. We have already explained that while § 7502 is truly an exception to the rule of actual timely receipt, the common-law mailbox rule is not. Indeed, the Sixth Circuit admitted as much in its later decision in *Carroll*, 71 F.3d at 1232 n.2, thereby undercutting its own rationale in *Miller* despite reluctantly adhering to the case's holding as binding precedent.[13] Under the common-law mailbox rule, the ultimate

---

[13] The *Carroll* Court noted that several judges on the Sixth Circuit (including *Carroll*'s author, Judge David Nelson) had voted to reconsider *Miller*'s holding *en banc*, but the number

question is still whether the document was physically delivered before the deadline; the mailbox rule simply helps determine when that delivery occurred. As noted, § 7502, by contrast, actually excuses late receipt. That provision is thus an extra taxpayer protection beyond what the common-law mailbox rule provides. Even if Congress sought to limit the reach of § 7502's extra-statutory protection via § 7502(c), it does not follow that it simultaneously sought to repeal the more modest protection that already existed at common law. The text of the statute does not call for this result, and any conclusion that Congress

---

was less than the needed majority. *Id.* at 1232. It also conceded:

> Strictly speaking, of course, the taxpayers in the case at bar are not contending that they come within a judicially created "exception" to the rule that a filing is complete only at the time of actual delivery to the IRS. The taxpayers contend, rather, that when they proved that their S-corporation election form was mailed to the IRS 54 days in advance of the filing deadline, they made a prima facie showing of timely receipt—actual receipt, not constructive receipt—by the agency. Like the Eighth Circuit, we are satisfied that the contention is inconsistent with *Miller.*

*Id.* n.2

intended it would be, in our view, speculation.

In sum, we hold that, at least where a taxpayer does not rely on § 7502's protection and produces circumstantial evidence beyond its own testimony that it mailed the tax document early enough to allow timely physical delivery, it may avail itself of the common-law mailbox rule.[14]

---

[14] The Department of the Treasury has proposed a regulation that, if valid, would seemingly negate this holding for some future cases, providing that "[o]ther than direct proof of actual delivery, proof of proper use of registered or certified mail is the exclusive means to establish *prima facie* evidence of delivery of a document to the agency, officer, or office with which the document is required to be filed," and that "[n]o other evidence of a postmark or of mailing will be *prima facie* evidence of delivery or raise a presumption that the document was delivered." Timely Mailing Treated as Timely Filing, 69 Fed. Reg. 56,377 (proposed Sept. 21, 2004) (to be codified at 26 C.F.R. § 301.7502-1(e)(1)). Even if ultimately adopted, however, the regulation would not affect cases like this one where the documents were mailed before September 21, 2004. *Id.* (to be codified at 26 C.F.R. § 301.7502-1(g)(4)) (stating that the proposal, "when published as final regulations, will apply to all documents mailed after September 21, 2004"). For discussion, see Donald T. Williamson & A. Blair Staley, *Are the Proposed Timely Mailing/Timely Filing Regulations Timely?*, 108 Tax Notes 597 (Aug. 1, 2005).

### d. The Fund Is Eligible to Avail Itself of the Mailbox Rule

Here, the District Court should have applied, but did not apply, the mailbox rule. The Fund does not rely on § 7502's protection, and the evidence suggesting that refund requests were mailed on May 8, 2003 and June 13, 2003 goes beyond the Fund's bare testimony. As the Fund points out, that evidence consists not only of Ms. O'Neill's sworn affidavit, but also, for instance, the following: Mr. Pontarelli's testimony that he drafted the May 8 Letter on or before May 8, 2003; Mr. Pontarelli's testimony that Revenue Officer Dugan expressly acknowledged receipt of the May 8 Letter; a computer printout showing that the June 13 Letter was in fact composed by Ms. O'Neill on June 13; the IRS's actions after June 2003, in particular its meeting with the Fund's representatives in August 2003, which suggest that there was a precipitating event—such as the mailing of a refund request—that triggered this governmental response; and Revenue Officer Dugan's own testimony that Mr. Pontarelli and Ms. O'Neill were "frantic," "in an uproar," and "so nervous and concerned" when they called him on May 7, 2003. Accordingly, the District Court erred in denying the Fund the benefit of the mailbox rule.

### V. Conclusion

O'Neill lacks standing to sue the United States for a refund, as 28 U.S.C. § 1346(a)(1) has conferred no right to sue

on O'Neill and it does not qualify for third-party standing to assert the Fund's rights under the statute. Accordingly, we affirm the District Court's grant of summary judgment to the Government on this issue.

However, we disagree with granting summary judgment to the Government on whether the Fund timely filed its refund request. There is sufficient direct evidence of pre-June 25, 2003 receipt of the refund requests to raise a genuine issue of material fact. Moreover, because the Fund does not rely on § 7502's protection and produced circumstantial evidence beyond its own testimony that O'Neill mailed the refund requests early enough to allow receipt by the IRS before the deadline, it may avail itself of the common-law mailbox rule. Accordingly, we vacate the District Court's order to the extent it granted summary judgment on the timely filing issue and remand the case for further proceedings.