PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 10-1510


BIMBO BAKERIES USA, INC.

v.

CHRIS BOTTICELLA,

Appellant


On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 2-10-cv-00194)
Honorable R. Barclay Surrick, District Judge


Argued June 3, 2010


BEFORE: SMITH, FISHER, and
GREENBERG, Circuit Judges

(Filed: July 27, 2010)

Michael L. Banks (argued)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA 19103

　　Attorney for Appellee

Elizabeth K. Ainslie
Joseph Anclien (argued)
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Philadelphia, PA 19103

　　Attorneys for Appellant

———

OPINION OF THE COURT

———

GREENBERG, Circuit Judge,

## I.  INTRODUCTION

This matter comes on before this Court on an interlocutory appeal from an order of the District Court dated February 9, 2010, and entered on February 12, 2010, granting appellee's motion for a preliminary injunction. Bimbo Bakeries USA, Inc. v. Botticella, No. 10-0194, 2010 WL

571774 (E.D. Pa. Feb. 9, 2010). The issue on appeal is whether the District Court erred in enjoining appellant Chris Botticella, formerly a senior executive at appellee Bimbo Bakeries USA, Inc. ("Bimbo"), from working for one of Bimbo's competitors until after the Court resolved the merits of Bimbo's misappropriation of trade secrets claim against Botticella. The Court intended that the preliminary injunction would last for about two months until the trial but, because of this appeal and a stay of the District Court proceedings following the filing of this appeal, the preliminary injunction has remained in effect. For the reasons we set forth below, we will affirm the order of the District Court.

## II. BACKGROUND

### A.    Botticella's Employment at Bimbo

Bimbo, a Delaware corporation with its principal place of business in Pennsylvania, is one of the four largest companies in the United States baking industry. Bimbo and its affiliates produce and distribute baked goods throughout the country under a number of popular brand names including Thomas', Entenmann's, Arnold, Oroweat, Mrs. Baird's, Stroehmann, and Boboli. Botticella, a California resident, who already had experience in the baking industry, began working for Bimbo in 2001 and was, until January 13, 2010, its Vice President of Operations for California. In that position in which Botticella earned an annual salary of $250,000, he was directly responsible for five production facilities and oversaw a variety of areas including product

3

quality and cost, labor issues, and new product development. In addition Botticella worked closely with Bimbo's sales staff on sales promotion and capacity planning, and also was responsible for overseeing the operations of "co-packers" in his region, i.e., third-party manufacturers under contract with Bimbo.

As one of Bimbo's senior executives, Botticella had access to and acquired a broad range of confidential information about Bimbo, its products, and its business strategy. For example, he was one of a select group of individuals with access to the code books containing the formulas and process parameters for all of Bimbo's products. He also regularly attended high-level meetings with other top Bimbo executives to discuss the company's national business strategy. Significantly, as Bimbo repeatedly has noted throughout these proceedings, Botticella was one of only seven people who possessed all of the knowledge necessary to replicate independently Bimbo's popular line of Thomas' English Muffins, including the secret behind the muffins' unique "nooks and crannies" texture. Thomas' English Muffins is the source of approximately half a billion dollars worth of Bimbo's annual sales income.

While employed at Bimbo, Botticella signed a "Confidentiality, Non-Solicitation and Invention Assignment Agreement" with Bimbo on March 13, 2009, in which he agreed not to compete directly with Bimbo during the term of his employment, not to use or disclose any of Bimbo's confidential or proprietary information during or after the term of his employment with Bimbo, and, upon ceasing employment by Bimbo, to return every document he received

4

from Bimbo during the term of his employment. App. at 214-18. The agreement, however, did not include a covenant restricting where Botticella could work after the termination of his employment with Bimbo. The agreement contained a choice of law provision providing that Pennsylvania law would govern any dispute arising from the agreement. Moreover, the agreement provided that certain state and federal courts in Pennsylvania would have jurisdiction over litigation arising from the agreement and over the parties to that litigation. Thus, although this litigation seems only marginally related to Pennsylvania, Bimbo filed it in the United States District Court for the Eastern District of Pennsylvania, which has exercised jurisdiction.

### B. The Hostess Job Offer

On September 28, 2009, one of Bimbo's primary competitors in the baking industry—Interstates Brand Corporation, which later changed its name to Hostess Brands, Inc. (collectively, "Hostess")—offered Botticella a position in Texas as Vice President of Bakery Operations for its eastern region. The proposed position carried a base salary of $200,000, along with various stock option and bonus opportunities. On October 15, 2009, Botticella accepted the Hostess position and agreed to begin in January 2010. Botticella did not disclose his plans to Bimbo for several months, and he therefore continued to be engaged fully in his work at Bimbo and to have full access to Bimbo's confidential and proprietary information even after he accepted the Hostess position. Botticella maintains that he

5

continued working for Bimbo notwithstanding his acceptance of the Hostess position in order to receive his 2009 year-end bonus and to complete two Bimbo projects for which he had responsibility.

After Botticella accepted the Hostess offer and while Bimbo still employed him, Hostess directed him to execute an "Acknowledgment and Representation Form," which essentially indicated that Hostess was not interested in any confidential information, trade secrets, or other proprietary information that Botticella had acquired from Bimbo, and that Botticella would not disclose such information to Hostess.[1]

---

[1]The agreement stated:

> I acknowledge that [Hostess] has advised me that it is not interested in, nor does it want, any confidential information or trade secrets or other proprietary information that I may have acquired through any prior employment or business relationship, including without limitation any information or 'know-how' related to the manufacturing of Thomas brand products. I further acknowledge that I have not previously, and will not in the future, disclose to Hostess any confidential or proprietary information belonging to any previous employer. Specifically, I acknowledge that Hostess has instructed me not to disclose to it or to use in the course of any job for it that I may be [sic] have at any time, any confidential or proprietary information belonging

6

App. at 272.  Botticella signed the form on December 7, 2009.

Botticella informed his supervisor at Bimbo on January 4, 2010, that he was planning to leave Bimbo on January 15.[2] But Botticella did not at that time indicate that he was leaving

<hr/>

to any previous employer.  I represent that I have and will not bring to Hostess'[s] work place, use for the benefit of, or in any way share with Hostess any confidential or proprietary information belonging to any previous employer.

I represent that I am not a party to any currently effective employment contract, covenant not to compete or other agreement that could potentially have any bearing on my ability to accept employment with Hostess, and that Hostess has instructed me that I am not to perform any action, directly or indirectly, in the course of any duties or responsibilities that I may have at any time for it, that would violate the terms of any currently effective contract to which I am a party.

App. at 272.

[2]Botticella asserts that he testified in his deposition that he advised "his boss" at Bimbo in early December of 2009 "that he would be leaving" Bimbo.  Appellant's br. at 8 n.1.  But he indicates that this testimony was not introduced at the hearing on the preliminary injunction.  He does not claim, however, that at that time he advised Bimbo that he was joining Hostess.

to work for a competitor. Moreover, there is no indication in the record that Bimbo asked him about his future employment plans. On January 12, Hostess announced that its Vice President of Bakery Operations for the eastern region was retiring and that Botticella would be replacing him, effective January 18. Bimbo personnel learned of the announcement and the next day, January 13, the company's Vice President for Human Relations requested that Botticella contact him. Botticella did so at approximately 10:00 a.m. PST and in the course of the ensuing telephone conversation disclosed his intention to work for Hostess. Bimbo directed Botticella to vacate its offices that day.[3]

### C.   Botticella's Use of Confidential Information Following the Hostess Offer

In the period between when Botticella accepted the Hostess offer on October 15, 2009, and when he ceased working for Bimbo on January 13, 2010, he continued to have all the access to Bimbo's confidential and proprietary information befitting a trusted senior executive. For instance, Botticella attended a meeting with Bimbo's president and other Bimbo officers in December 2009 at which the participants discussed confidential information regarding the

---

[3]Because Botticella had accrued eleven weeks of vacation time with Bimbo, he remained on the company's payroll throughout the District Court proceedings. Botticella's present employment status is not apparent from the record.

8

company's strategic plan for California. Botticella concedes that if he had disclosed his intention to work for Hostess, Bimbo would have restricted his access to this and other types of information. Indeed, Botticella maintains that he no longer felt "comfortable" being privy to Bimbo's confidential information following his acceptance of the Hostess offer and that, accordingly, when he received emails and electronic documents containing confidential information, he deleted them, and that when he was exposed to confidential information during presentations at meetings, he "blocked it" out of his head. App. at 195, 197.[4]

In one instance over the Christmas holiday, Botticella deleted a number of documents from his company-issued laptop computer. These documents included both items of a personal nature, such as his resume, and a number of work-related documents containing confidential information. Botticella claimed that he deleted these documents because he "didn't think th[ey] would [have] any value to anybody." App. at 198. Nevertheless, when Botticella returned to his office at Bimbo on January 4, 2010, he asked a computer technician to restore the files because "he wanted to have them back just in case for the next weeks we needed to have a meeting or something." App. at 198. Bimbo's technician then restored the files to the computer.

---

[4]We are quite uncertain as to how an individual can block out information from his head for a human mind does not function like a computer from which, through an electronic process, materials may be deleted.

Following Botticella's departure, Bimbo hired E. Brian Harris, a computer forensics expert, to investigate Botticella's use of his company laptop during December 2009 and January 2010. Harris's testing revealed that a user who logged in as Botticella had accessed a number of confidential documents during the final weeks of Botticella's employment at Bimbo. In particular, the testing revealed that the person logging in as Botticella had accessed twelve files within a span of thirteen seconds on January 13, 2010, Botticella's last day at Bimbo.[5] Significantly this access occurred minutes after the phone call in which Botticella finally disclosed to Bimbo his plans to work for Hostess and Bimbo told him to cease working for it.

There were several similar patterns of access in the weeks leading up to January 13. According to Harris, this type of activity—multiple files being accessed more or less simultaneously—was "inconsistent with an ordinary usage whereby individual files are opened and either read or edited." App. at 238. Harris concluded that the activity was, however, consistent with copying a group of files at the same time, but he could not determine conclusively whether the files Botticella had accessed had been copied and deleted or never copied at all. App. at 238. The testing also revealed that three external storage devices—a portable device known as a "thumb" or "flash" drive and two external hard drives—had at one time or another been connected to Botticella's computer, although it was unclear exactly when these devices had been

---

[5]Botticella does not deny that he was the person logging in under his name.

10

used.  Bimbo located the thumb drive and one of the hard drives but Harris could not determine conclusively whether or not any files had been copied onto the devices from Botticella's computer.  Harris was not provided with the second external hard drive.  According to Bimbo, that device "is unaccounted for."  Appellee's br. at 11.

A number of the files accessed from Botticella's laptop during his final days at Bimbo were highly sensitive and their possession by a competitor would have been damaging to Bimbo.  As described by the District Court, these documents include "Bimbo's cost-reduction strategies, product launch dates, anticipated plant and line closures, labor contract information, production strengths and weaknesses of many Bimbo bakeries, and the cost structure for individual products by brand."  Bimbo Bakeries, 2010 WL 571774, at *7.  There were, however, more mundane documents such as a presentation titled "Safety Short - Wet Floors" included in these groups of files.  App. at 237.  In his video-taped deposition, portions of which were presented at the preliminary injunction hearing, Botticella admitted to copying files periodically from his laptop to external devices during his final weeks at Bimbo, but maintained that he had done so only to practice his computer skills in preparation for his new position at Hostess.  Despite an earlier denial, he eventually admitted to conducting such "practice" exercises in January 2010.  The District Court found that Botticella's explanation of his use of the laptop computer and the external devices was "confusing at best" and "not credible."  Bimbo Bakeries, 2010 WL 571774, at *6.

11

D.    Procedural History

After Botticella left Bimbo and joined Hostess, Bimbo brought this action seeking to protect its trade secrets and then promptly moved for preliminary injunctive relief. The District Court held a hearing on Bimbo's motion at which Bimbo presented portions of Botticella's video taped deposition as well as live testimony from Harris and Daniel Babin, one of Bimbo's senior executives. Botticella's counsel cross-examined Bimbo's witnesses but did not present any evidence on Botticella's behalf. The District Court granted Bimbo's motion and preliminarily enjoined Botticella from commencing employment with Hostess and from divulging to Hostess any confidential or proprietary information belonging to Bimbo. The Court further ordered Botticella to return to Bimbo any of the company's confidential or proprietary information in his possession. The Court issued the preliminary injunction on February 9, 2010, and provided that it was to remain in effect until a determination on the merits of the controversy at a trial, which the Court scheduled to begin on April 12, 2010. Nevertheless, notwithstanding the early trial date, Botticella appealed from the February 9, 2010 order to this Court on February 16, 2010. The case remains untried and pending in the District Court as that Court on March 5, 2010, after a conference with the attorneys, postponed the trial and stayed all proceedings until its further order. We have expedited our consideration of this appeal.


III.  JURISDICTION AND STANDARD OF REVIEW

12

The District Court had jurisdiction over this diversity of citizenship action pursuant to 28 U.S.C. § 1332(a).[6]  We exercise jurisdiction over Botticella's interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1).  When reviewing a district court's grant of a preliminary injunction, we review the court's findings of fact for clear error, its conclusions of law de novo, and the ultimate decision granting the preliminary injunction for an abuse of discretion.  Miller v. Mitchell, 598 F.3d 139, 145 (3d Cir. 2010) (citing McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009)).

## IV.  DISCUSSION

In determining whether to grant a preliminary injunction, a court must consider whether the party seeking the injunction has satisfied four factors:  "(1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief."  Miller, 598 F.3d at 147 (citing Child Evangelism Fellowship of New Jersey Inc. v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004)).  We turn first to the question of whether Bimbo has demonstrated a likelihood of success on the merits, an inquiry that was the primary focus of the District Court, and,

---

[6]Bimbo is a citizen of Delaware and Pennsylvania and Botticella is a citizen of California.

13

consequently, also is the primary focus of the parties on this appeal.

A.      Likelihood of Success on the Merits

The District Court found that Bimbo was likely to prevail on the merits of its misappropriation of trade secrets claim.   Under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), which is applicable in this case, a trade secret is defined as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:
>
> > (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> >
> > (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

14

12 Pa. Cons. Stat. Ann. § 5302 (West 2004); see also Rohm and Haas Co. v. Lin, 992 A.2d 132, 143 n.4 (Pa. Super. Ct. 2010) ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.") (internal citation omitted). The Pennsylvania courts look to the following factors to determine whether information is protected as a trade secret: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.[7] Crum v. Bridgestone/Firestone North American Tire, LLC, 907 A.2d 578, 585 (Pa. Super. Ct. 2006).

Applying these standards, the District Court determined that during Botticella's employment at Bimbo, he had access to and acquired a number of Bimbo's trade secrets, including:

---

[7]"The PUTSA displaced Pennsylvania's common law tort for misappropriation of trade secrets, but there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'" Youtie v. Macy's Retail Holding, Inc., 626 F. Supp. 2d 511, 522 n.10 (E.D. Pa. 2009).

15

a. Information in Bimbo's code books, as well as and including formulas and designs for Thomas' English Muffins, Oroweat brand products, Sandwich Thins products, and other Bimbo products.

b. Bimbo's strategy for increasing profitability, embodied in a road map in January of 2009, which included line closures, plant closures, new process improvements, formula optimizations, and new product launches, and which achieved cost savings of $75 million over the course of a year.

c. Knowledge of how Bimbo produces bread 'from scratch' instead of using pre-mixed ingredients.

d. Documents copied by [Botticella] from his work computer onto an external storage device with no credible explanation. . . .

e. Bimbo's promotional strategies with respect to specific customers.

f. Bimbo's cost positions.

g. Identities of Bimbo's customers targeted for upcoming bids.

Bimbo Bakeries, 2010 WL 571774, at *10.  The District Court then determined that Bimbo likely would be able to

16

prove at trial that Botticella would misappropriate these trade secrets if allowed to work at Hostess.

A person has misappropriated a trade secret under Pennsylvania law when he acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent. 12 Pa. Cons. Stat. Ann. § 5302 (West 2004). A court may enjoin the actual or threatened misappropriation of a trade secret. Id. § 5303(a). After determining that Bimbo was seeking an injunction on the basis of threatened misappropriation, the District Court found there was "a substantial likelihood, if not an inevitability, that [Botticella] will disclose or use Bimbo's trade secrets in the course of his employment with Hostess." Bimbo Bakeries, 2010 WL 571775, at **11-14. Accordingly, the Court concluded that Bimbo had demonstrated a likelihood of succeeding on the merits of its claim.

Botticella contends this conclusion was wrong as a matter of law because (a) a court only can enjoin a defendant from beginning a new job to protect a former employer's technical trade secrets, (b) such an injunction only can issue where it would be "virtually impossible" for the defendant to perform his new job without disclosing trade secrets, (c) Bimbo did not present any evidence from which the District Court could conclude that Botticella's responsibilities at Hostess would lead him to disclose Bimbo's trade secrets, and (d) the District Court drew impermissible adverse inferences against Botticella in a way that effectively shifted the burden of proof from Bimbo to Botticella.

17

## 1.    Air Products and Inevitable Disclosure

The parties disagree about the circumstances that must be found to exist before a court can enjoin a defendant from beginning new employment.    In its opinion granting the preliminary injunction, the District Court stated:

> When analyzing threatened misappropriation of trade secrets, Pennsylvania courts apply the 'inevitable disclosure doctrine.' That doctrine essentially posits that 'a person may be enjoined from engaging in employment or certain aspects of his employment where that employment is likely to result in the disclosure of information, held secret by a former employer, of which the employee gained knowledge as a result of his former employment situation.['] The scope of the injunctive relief depends on the particular circumstances of the case.

Bimbo Bakeries, 2010 WL 571774, at *11 (citing Victaulic Co. v. Tieman, 499 F.3d 227, 234 (3d Cir. 2007) (omitting citations); Air Prods. & Chems., Inc. v. Johnson, 442 A.2d 1114, 1120 (Pa. Super. Ct. 1982)).    In other words, the District Court concluded, albeit somewhat paradoxically, that Pennsylvania courts apply the "inevitable disclosure doctrine" to grant injunctions based not on a trade secret's inevitable disclosure but on its likely disclosure.   Cf. Pepsico, Inc. v. Redmond, 54 F.3d 1262, 1269 (7th Cir. 1995) ("[a] plaintiff may prove a claim of trade secret misappropriation by

18

demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.") (emphasis added). While we agree with the District Court that Pennsylvania law empowers a court to enjoin the threatened disclosure of trade secrets without requiring a plaintiff to show that disclosure is inevitable, we do not consider that an injunction granted absent such a showing was issued pursuant to the "inevitable disclosure doctrine."

The leading Pennsylvania decision to discuss the inevitability of trade secret disclosure is Air Products & Chemicals, Inc. v. Johnson.[8] In that case Air Products, a manufacturer and distributor of industrial gas, sought an order enjoining Johnson, one of its former employees who primarily was responsible for selling on-site gas, from working in the on-site gas division of a competitor, Liquid Air, that lagged behind Air Products in the on-site gas market.[9] 442 A.2d at 1116-18. The trial court determined that Johnson, who had an engineering background, had acquired a number of technical and commercial trade secrets relevant to the operation and

_____

[8]While courts across the country have considered the applicability and scope of the inevitable disclosure doctrine, see generally Brandy L. Treadway, An Overview of Individual States' Application of Inevitable Disclosure: Concrete Doctrine or Equitable Tool?, 55 SMU L. Rev. 621, 626-49 (2002), our focus in this diversity action is on the decisions of the Pennsylvania courts.

[9]"'On-site' gas serves large industrial customers. Gas is piped to the customer." Air Prods., 442 A.2d at 1116.

19

sale of on-site gas during his employment at Air Products, and that an injunction prohibiting Johnson from working in on-site sales at Liquid Air was necessary because "[i]t would be impossible [for Johnson] to perform his managerial functions in on-site work without drawing on the knowledge he possesses of Air Product[s]'s confidential information." Id. at 1122 (quoting trial court opinion).

On appeal, the Superior Court affirmed, agreeing with the trial court that Johnson possessed trade secrets belonging to Air Products that included technological innovations as well as commercial information such as "the status of negotiations with customers, proposed plant configurations and methods of delivery as well as analysis of market opportunities." Id. at 1121 (quoting trial court opinion). In reaching this conclusion, the Court emphasized that "trade secrets need not be technical in nature" to be protected under Pennsylvania law. Id. at 1124 (citing Macbeth-Evans Glass Co. v. Schnelbach, 86 A. 688 (Pa. 1913)).

With respect to the probability of disclosure required to warrant an injunction, the Superior Court stated at the outset of its analysis that Pennsylvania law permits the issuance of an injunction where a defendant's new employment "is likely to result in the disclosure" of a former employer's trade secrets. Id. at 1120 (emphasis added). The Court then determined that it was reasonable for the trial court to issue an injunction based on the inevitability that Johnson would disclose trade secrets, but the Superior Court explicitly chose "not [to] adopt the reasoning of the trial court or its use of the term inevitable." Id. at 1124. Based on these statements it seems clear that the Superior Court believed that the trial

20

court permissibly could have granted the injunction even if the disclosure of trade secrets was not inevitable.

2. Protection for Non-Technical Trade Secrets

Botticella argues that "[w]hile confidential information concerning either technical or commercial issues can be protected as a trade secret, the inevitable disclosure doctrine, which prevents the defendant from taking on employment in his chosen field, applies only to technical trade secrets." Appellants br. at 28 (citing Iron Age Corp. v. Dvorak, 880 A.2d 657, 665 (Pa. Super. Ct. 2005); Oberg Indus., Inc. v. Finney, 555 A.2d 1324, 1327 (Pa. Super. Ct. 1989)). Our review of the relevant decisional law leads us to reject Botticella's proposed distinction between technical and other information. To start with, it is clear that "trade secrets need not be technical in nature" to be protected fully by Pennsylvania law, Air Prods., 442 A.2d at 1124; see also Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A.2d 1214, 1228 (Pa. Super. Ct. 1989) (en banc) ("[T]he particular character of the information is not relevant . . . . [It] may consist of compilations of purely commercial information.") (citing Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838 (Pa. 1957)). Furthermore, courts applying Pennsylvania law are empowered to enjoin both the actual and the threatened misappropriation of trade secrets. 12 Pa. Cons. Stat. Ann. § 5303(a) (West 2004). An injunction against employment therefore is simply one weapon in an equity court's arsenal to prevent the threatened misappropriation of trade secrets,

21

regardless of those secrets' technical or non-technical character.

In arguing that a court only may enjoin a defendant from beginning a new job to protect a former employer's technical trade secrets, Botticella relies primarily on two opinions of the Pennsylvania Superior Court applying Air Products. In Oberg Industries, Inc. v. Finney, the trial court had enjoined the general sales manager of a company that manufactured carbide stamping dies from working for one of that company's competitors. 555 A.2d at 1325. The court believed the employee, Finney, inevitably would disclose the trade secrets of his former employer, Oberg Industries, if allowed to work in the new position. Id. at 1326. The information the trial court classified as trade secrets consisted of customer information reports, including a master customer directory and histories of quoted prices and completed sales for various customers. Id. at 1325.

On appeal the Superior Court did not clearly state whether or not it considered this information to constitute trade secrets under Pennsylvania law. Nevertheless, the Court vacated the injunction because (1) the case did not involve a restrictive covenant, (2) there was no evidence that Finney took Oberg's confidential information to use in his new position, (3) some of the confidential reports at issue, "such as the list of customers and their contact persons, were so voluminous that they could not have been committed to memory," and (4) Finney's position at Oberg and the knowledge he obtained while in that position did not demonstrate an inevitability of disclosure comparable to that found in Air Products. Id. at 1327. With respect to the latter

22

point, the Court opined that the focus of Air Products was on the employee's "engineering background and the special knowledge he possessed relating to a method of oil recovery not yet developed by the competitor company," despite the circumstance that the employee, like Finney, was involved in sales. Id. at 1327.

In Iron Age Corp. v. Dvorak, both the trial court and the Superior Court refused to enjoin a former district sales manager of a footwear manufacturer from using or contacting any of the company's current or prospective customers. 880 A.2d 567. The employee, Dvorak, had left the company, Iron Age, to work for a competitor. Id. at 661. The Superior Court affirmed the denial of the requested injunction because the trial court reasonably concluded that the information at issue—Iron Age's customer lists—was "available to competitors through legitimate means and cannot be declared a trade secret." Id. at 664. The Court went on to distinguish Air Products on the ground that:

> In Air Products, the employee possessed intimate knowledge of his former employer's research and development data for on-site gas delivery technologies. The employee's new employer was attempting to develop similar technologies, and the employee was hired to provide research and development data obtained through his previous employment. In the instant case, [Dvorak] possesses no such technical knowledge, and [his] new employer already has an extensive customer base. [Dvorak] was not

23

> hired to provide information he obtained
> through his employment with [Iron Age].

Id. at 665 (citing Air Prods., 442 A.2d at 1117). The Court also noted that Dvorak had signed an agreement with his new employer promising not to disclose any of Iron Age's secrets. Id.

Though some passages in Oberg and Iron Age suggest that Pennsylvania courts will enjoin new employment more readily when the disclosure of technical trade secrets, as distinguished from other materials, is threatened, those cases do not purport to establish an inflexible rule defining the scope of materials that can be subject to trade secret protection, nor do they limit the granting of injunctive relief affecting new employment to circumstances involving technical trade secrets. Rather, these opinions reach fact-specific conclusions that the former employer was not entitled to injunctive relief against its departing employee barring him from working for a competitor. Overall, we conclude that the relevant Pennsylvania decisions, viewed as a group, suggest that (1) a determination of whether to grant injunctive relief in a trade secrets case and, if so, the proper scope of the relief, depends on a highly fact-specific inquiry into the situation in the case the court is considering and (2) a court conducting this inquiry has discretion to enjoin a defendant from beginning new employment if the facts of the case demonstrate a substantial threat of trade secret misappropriation.

24

Putting aside the fact that Botticella had access to and acquired confidential information of a technical nature about the formulas and ingredients for a variety of Bimbo products, he also had access to and acquired confidential information about Bimbo's long term strategies, operating costs, and customer negotiations. Botticella does not dispute that these types of information qualify as trade secrets under Pennsylvania law.[10] See Air Prods., 442 A.2d at 1121-22. Accordingly, the District Court had discretion to enjoin Botticella from working at Hostess to the extent this proposed employment threatened to lead to the misappropriation of these trade secrets.

3. The District Court Applied the Correct Standard

Botticella next argues that an injunction against employment can issue under Pennsylvania law only when it

---

[10]By contrast, in Iron Age the Superior Court found that the relevant information in that case did not even qualify as a trade secret. 880 A.2d at 664-65. Hence, there was no threat that the defendant's change in employment would cause him to misappropriate a trade secret. Likewise, the court in Oberg did not find any threat that trade secrets would be misappropriated, although its reasoning underlying that conclusion was not particularly clear. See 555 A.2d at 1327 ("Finney's position in the company and the knowledge he obtained while in that position do not demonstrate an inevitability of disclosure as that found in Air Products which would require the issuance of an injunction in this case.").

would be "virtually impossible" for an employee to fulfill his responsibilities for a new employer without disclosing a former employer's trade secrets. Appellant's br. at 23. Accordingly, Botticella contends that the District Court erred as a matter of law when it granted Bimbo an injunction on the basis that Botticella's employment with Hostess would lead to a "sufficient likelihood or substantial threat of disclosure of a trade secret," a lesser showing than it would have been "virtually impossible" to avoid the disclosure of trade secrets during Botticella's employment at Hostess. Appellant's br. at 22. Notwithstanding dictum to the contrary in one of our own recent opinions, see Victaulic, 499 F.3d at 234, we conclude that the District Court applied the correct standard.

The trial court in Air Products enjoined the defendant from working in on-site gas sales at his new employer because it concluded it would be impossible for the defendant to work in that field without disclosing his former employer's trade secrets. 442 A.2d at 1122. On appeal the Superior Court affirmed, but noted it was "not adopt[ing] the reasoning of the trial court or its use of the term inevitable." Id. at 1124. The Superior Court subsequently has stated that "[t]he proper inquiry" in determining whether to grant an injunction to prevent the threatened disclosure of trade secrets is "whether there is sufficient likelihood, or substantial threat" of a defendant disclosing trade secrets.[11] Den-Tal-Ez, 566 A.2d at

[11]While the threat of trade secret disclosure in Den-Tal-Ez arose from a proposed merger between two companies and not from an employee leaving one company to work for another, there is no indication that the Superior Court's discussion of the relevant

26

1232 (citing Air Prods., 442 A.2d at 1122-25; SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1263-64 (3d Cir. 1985)); see also A.M. Skier Agency, Inc. v. Gold, 747 A.2d 936, 942 (Pa. Super. Ct. 2000) (citing Den-Tal-Ez, 566 A.2d at 1232). The District Court in this case applied the standard that the Superior Court applied in Den-Tal-Ez.

In arguing for a "virtual impossibility" standard, Botticella understandably relies heavily on our decision in Victaulic. In that case, Tieman, a sales representative, had violated a covenant not to compete with his former employer Victaulic, a mechanical device manufacturer, by working for a competitor. Victaulic, 499 F.3d at 230-31. Victaulic brought a misappropriation of trade secrets claim in addition to asserting several claims based on the covenant not to compete. Victaulic sought injunctive relief in the action. Id. at 231. The District Court dismissed Victaulic's covenant claims and requested additional briefing on the trade secrets claim. Id. But before the trade secrets claim was resolved Victaulic filed an interlocutory appeal, asserting that we had jurisdiction under 28 U.S.C. §1292(a)(1) on the ground that the District Court's dismissal of the covenant claims effectively denied Victaulic's request for a preliminary injunction. Id.

In determining that we had jurisdiction to hear the appeal, we concluded that "Victaulic did not request a

standard for injunctive relief in trade secrets cases, which was gleaned from Air Products, was intended to be limited to the merger situation. See Den-Tal-Ez, 566 A.2d at 1232-33.

27

preliminary injunction on its trade secrets claim, so the District Court's dismissal of the covenant claims left it with no means of receiving preliminary relief." Id. at 232. We then went on to state that "[e]ven if we believed that Victaulic requested a preliminary injunction on its trade secrets claim, we would find jurisdiction" because any trade secrets injunction potentially available to Victaulic necessarily would be narrower than that requested on the covenant claims. Id. We stated:

> [S]omething like Victaulic's requested relief (preventing Tieman from selling similar products for [his new employer] for a year) could fit a trade secrets claim, as it is possible for a court to enjoin an employee working in the relevant industry or soliciting customers for some period of time. But such a wide-ranging injunction is atypical; rather, the usual injunction merely prevents the employee from disclosing specified trade secrets. . . . Under Pennsylvania law, a broader injunction only lies when it is 'virtually impossible . . . [for the employee] to perform his . . . duties for [his new employer] without in effect giving [it] the benefit of [his] confidential information.'

Id. at 234 (quoting Air Prods., 442 A.2d at 1123). Because Victaulic "had not alleged or argued inevitable disclosure" in its trade secrets claim, we concluded that the District Court lacked the authority to issue a broad injunction based on that claim. Id.

28

In light of the scope of the District Court's injunction in the case now on appeal before us, we acknowledge that after one reads Victaulic it is possible to conclude that the District Court erred by granting the injunction without requiring Bimbo to show that it would be "virtually impossible" for Botticella to work at Hostess without disclosing Bimbo's trade secrets. But that reading would leave the following questions: (1) did Victaulic correctly interpret Pennsylvania law, and (2) if not, are we nevertheless bound by that interpretation in the present case because Victaulic is a precedential opinion issued by a prior panel of this Court?

Our review of Victaulic leads us to conclude that in that case we did not interpret Air Products in a way precisely consistent with Pennsylvania state precedents. The Court in Air Products took the passage that Victaulic quoted and containing the "virtually impossible" language directly from a decision of a United States District Court in Ohio in a case under Ohio law that had facts very similar to those in Air Products. See 442 A.2d at 1123 (quoting Emery Indus., Inc. v. Cottier, 202 U.S.P.Q. 829 (S.D. Ohio 1978)). The Superior Court in Air Products found the reasoning of the Emery decision "persuasive" and held that the trial court in Air Products acted reasonably by granting a preliminary injunction based on "precisely the reasoning of the court in Emery." Id. at 1124-25. Nevertheless, the Superior Court explicitly chose "not [to] adopt the reasoning of the trial court." Id. at 1125. It follows that the Superior Court also chose not to adopt the reasoning of the Emery court, it being "precisely" the same as that of the trial court in the case on appeal before the Superior Court.

29

The Superior Court subsequently stated that the "proper inquiry" in determining whether to grant an injunction to prevent the threatened disclosure of trade secrets is not whether a defendant inevitably will disclose a trade secret in the absence of injunctive relief, but instead whether "there is sufficient likelihood, or substantial threat, of defendant doing so in the future." Den-Tal-Ez, 566 A.2d at 1232 (citing Air Prods., 442 A.2d at 1122-25; SI Handling Sys.,753 F.2d at 1263-64). We therefore conclude that Air Product's repetition of the phrase "virtually impossible" in describing the Emery holding should not be interpreted as a statement of Pennsylvania's standard for granting injunctions in trade secrets cases, our suggestion to the contrary in Victaulic notwithstanding.

Inasmuch as we have concluded that Victaulic questionably interpreted Pennsylvania law, we next must determine whether we nevertheless are bound by its statement of that law. In this regard we start by recognizing that it is "the tradition of this court that the holding of a panel in a precedential opinion is binding on subsequent panels" and cannot be overruled absent consideration en banc.[12] Internal

---

[12]A second panel has the obligation to follow the law that a prior panel set forth even when the prior panel decision applied state law unless "there is persuasive evidence that [the law] has undergone a change" in which case "we are not bound by our previous panel decision if it reflected our reliance on state law prior to its modification." Robinson v. Jiffy Executive Limousine Co., 4 F.3d 237, 239-40 (3d Cir. 1993) (citing Smith v. Calgon Carbon Corp., 917 F.2d 1338, 1343 (3d Cir. 1990)).

30

Operating Procedure 9.1. It is also well established, however, that we are not bound by dictum in an earlier panel opinion. Abdelfattah v. Dept. of Homeland §., 488 F.3d 178, 185 (3d Cir. 2007) (citing Mariana v. Fisher, 338 F.3d 189, 201 (3d Cir. 2003)).

We conclude that the Victaulic panel's discussion of Air Products and the interplay between virtual impossibility and the inevitable disclosure doctrine was dictum and does not bind us in the present case. That discussion was not necessary to the panel's jurisdictional holding that Victaulic had failed to request a preliminary injunction on its trade secrets claim. On the contrary, the discussion occurred only in the context of a counterfactual hypothetical in which the Victaulic panel posited that, even if Victaulic had requested a preliminary injunction on its trade secrets claim, the Court nevertheless would have had jurisdiction. While we recognize that "where a decision rests on two or more grounds, none can be relegated to the category of obiter dictum," Philadelphia Marine Trade Ass'n -Int'l Longshoremen's Ass'n. Pension Fund v. Comm'r, 523 F.3d 140, 147 n.5 (3d Cir. 2008) (quoting Woods v. Interstate Realty Co., 337 U.S. 535, 537, 69 S.Ct. 1235, 1237 (1949)), we do not consider the Victaulic decision on jurisdiction to

---

We decided Victaulic in 2007, and since that time so far as we are aware there has not been a "clear statement by the Pennsylvania Supreme Court to the contrary or other persuasive evidence of a change in Pennsylvania law." See Smith, 917 F.2d at 1343 (emphasis removed). Accordingly, the holdings of the Victaulic panel bind us in the present case.

31

have rested on its interpretation of Pennsylvania's law of trade secrets with respect to its actual holding because with or without discussion of the counterfactual hypothetical, we would have held that we had jurisdiction. At bottom we merely held that the District Court had denied Victaulic all preliminary relief and thus we had jurisdiction. Accordingly, Victaulic does not prevent us from concluding that the District Court in this case applied the correct legal standard.[13]

---

[13]Botticella further argues for an "impossibility" standard by pointing to an unpublished memorandum opinion of the Pennsylvania Superior Court in Bacharach, Inc. v. Testo, Inc., No. 1257 WDA 2001 (Pa. Super. Ct. 2000), App. at 279-301. In that case, an employer argued that the Court could issue an injunction pursuant to Air Products based on "the mere 'likelihood'" that a trade secret might be disclosed. App. at 291. The Superior Court rejected this argument noting that in Air Products it only had "determined that the inevitable disclosure doctrine might be properly applied because 'it would be impossible for the employee to perform his duties at the new employer without disclosing trade secrets.'" App. at 291-92 (quoting Air Prods., 442 A.2d at 1124-25). Pursuant to Pennsylvania Superior Court Rule 65.37, an unpublished decision such as Bacharach cannot be considered as precedent or cited for any purpose relevant to the present case. Thus, Bacharach's interpretation of Air Products deserves little weight to the extent it conflicts with the Superior Court's precedential opinions. See A.M. Skier Agency, 747 A.2d at 942; Den-Tal-Ez, 566 A.2d at 1232. In any event, Bacharach stopped well short of requiring rigid adherence to the legal reasoning used by the trial court in Air Products. App. at 287 (rejecting notion that

### 4. Evidence of Botticella's Responsibilities at Hostess

Botticella next contends that the District Court erred by determining the probability that Botticella would disclose trade secrets while working at Hostess without requiring Bimbo to provide more detailed evidence of Botticella's anticipated responsibilities at Hostess. The record before the District Court contained little evidence in this regard apart from what could be inferred from Botticella's compensation package at Hostess and his title as the Vice President of Baking Operations for the eastern region.[14] Nevertheless the District Court concluded that Botticella's prospective position at Hostess was "substantially similar" to his former position at Bimbo, noting that the Hostess position was "an executive level position, with a salary comparable to his salary at Bimbo." Bimbo Bakeries, 2010 WL 571774, at *13. We agree that the record supports the conclusion that in his new position at Hostess, Botticella would have broad oversight over bakery operations, just as he had at Bimbo. Accordingly, the District Court did not abuse its discretion by preliminarily determining that the Bimbo and Hostess positions were substantially similar.

---

"Air Products enshrines the 'inevitable disclosure' doctrine as an inviolable rule of law").

[14]The District Court also noted that in his position at Hostess, Botticella would report to Hostess's Senior Vice President for Bakery Operations. Bimbo Bakeries, 2010 WL 571774, at *13.

33

5. Adverse Inference Based on Botticella's Failure to Testify

The District Court determined that Botticella's conduct following his acceptance of the Hostess job offer demonstrated his intention to use Bimbo's trade secrets during his employment with Hostess. The District Court bolstered this determination by drawing an adverse inference from Botticella's failure to testify at the preliminary injunction hearing. In so doing, the District Court relied on our decision in SI Handling Systems, Inc. v. Heisley, where we stated that because the misappropriation of a trade secret often must be proved by "construct[ing] a web of perhaps ambiguous circumstantial evidence" that outweighs the defendants' direct denial, the failure of defendants to testify in the face of a strong showing that a misappropriation or misuse occurred "justifies the inference that their testimony would be unfavorable to their cause." 753 F.2d at 1261 (internal citations omitted). On the other hand, Botticella contends that an adverse inference was inappropriate because he chose not to put forward any evidence at the preliminary injunction hearing. In support of this position he points to Stowe Township v. Standard Life Ins. Co. of Indiana, where we stated that "whatever inference might otherwise be available from the failure to call a witness is not permissible when a defendant chooses to put on no evidence at all, in apparent reliance on its determination that plaintiff has not met its burden." 507 F.2d 1332, 1338 (3d Cir. 1975).

Even assuming that the District Court erred by drawing an adverse inference from Botticella's failure to testify, the conclusion that Botticella intended to use Bimbo's trade

34

secrets during his employment with Hostess rests on a solid evidentiary basis, namely, Botticella's "not disclosing to Bimbo his acceptance of a job offer from a direct competitor, remaining in a position to receive Bimbo's confidential information and, in fact, receiving such information after committing to the Hostess job, and copying Bimbo's trade secret information from his work laptop onto external storage devices." Bimbo Bakeries, 2010 WL 571774, at *13. Accordingly, the District Court did not abuse its discretion by determining that Bimbo demonstrated a likelihood of success on its misappropriation of trade secrets claim.

B.      Irreparable Harm

The District Court concluded that Bimbo would suffer irreparable harm absent injunctive relief because the disclosure of its trade secrets to Hostess would put Bimbo at a competitive disadvantage that a legal remedy could not redress. On appeal, Botticella does not contest this finding apart from arguing that any harm Bimbo potentially might suffer from Botticella's employment at Hostess could be prevented by a narrow injunction—to which Botticella would stipulate—prohibiting Botticella only from disclosing Bimbo's trade secrets. We recognize that the evidence at trial may show that if Bimbo is entitled to relief that relief might be narrow yet adequate, just as Botticella suggests. Nevertheless, at this preliminary stage of the proceedings, the District Court did not abuse its discretion when, faced with evidence of Botticella's suspicious conduct during his final weeks at Bimbo, it determined that a stronger remedy was

35

needed in the interim to protect Bimbo from imminent irreparable harm. See Den-Tal-Ez, 566 A.2d at 1232 ("It is clear that under Pennsylvania law a court of equity may fashion a trade secrets injunction that is broad enough to ensure that the information is protected.") (quoting SI Handling Sys., 753 F.2d at 1265) (internal alteration removed).

C.    Harm to Botticella Caused by Injunctive Relief

The District Court concluded that the harm of Bimbo's trade secrets being disclosed to Hostess outweighed the harm to Botticella of not being able to commence employment at Hostess until the Court made a final determination of the merits following a trial, which it scheduled to start about two months from the date it issued the preliminary injunction.[15] The Court noted that Botticella would continue to receive compensation for the eleven weeks of vacation time that he had accrued before leaving Bimbo. We agree with the District Court's determination. In so doing, however, we note that even a temporary injunction prohibiting someone from pursuing his livelihood in the manner he chooses operates as a severe restriction on him that a court should not impose lightly. Nevertheless, such a temporary restriction on his

_____

[15]Botticella in effect extended the duration of the preliminary injunction by pursuing an interlocutory appeal for, as we indicated above, the District Court has stayed this case during this appeal.

36

employment is warranted where, as here, the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party. Following a disposition on the merits which in the normal course of events will follow the disposition of this appeal and the remand of the case to the District Court, if the Court holds that Bimbo is entitled to relief, the Court should fashion a remedy appropriate to protect Bimbo's trade secrets without unduly imposing on Botticella's right to pursue his chosen occupation.

D.     The Public Interest

We agree with the District Court's conclusion that granting the preliminary injunction was consistent with the public interest. There are several public interests at play in this case. As noted by the District Court, there is a generalized public interest in "upholding the inviolability of trade secrets and enforceability of confidentiality agreements." Bimbo Bakeries, 2010 WL 571774, at *16. Additionally, there is a public interest in employers being free to hire whom they please and in employees being free to work for whom they please. Of these latter two interests, Pennsylvania courts consider the right of the employee to be the more significant. See Renee Beauty Salons, Inc. v. Blose-Venable, 652 A.2d 1345, 1347 (Pa. Super. Ct. 1995) ("[T]he right of a business person to be protected against unfair competition stemming from the usurpation of his or her trade secrets must be balanced against the right of an individual to the unhampered pursuit of the occupations and livelihoods for

37

which he or she is best suited.") (internal citation omitted); see also Wexler v. Greenberg, 160 A.2d 430, 434-35 (Pa. 1960) (noting a societal interest in employee mobility). We are satisfied on the facts of this case that the public interest in preventing the misappropriation of Bimbo's trade secrets outweighs the temporary restriction on Botticella's choice of employment. See SI Handling Sys., 753 F.2d at 1265 (finding unnecessary an "extended analysis of the public interest [because] extensive precedent supports an injunctive remedy where the elements of a trade secret claim are established").

## V. CONCLUSION

For the reasons stated above, we will affirm the order of the District Court dated February 9, 2010, and entered on February 12, 2010, granting Bimbo's motion for a preliminary injunction and will remand the case to that Court for further proceedings.