PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 19-1722 and 19-1752
_____

ADVANCED FLUID SYSTEMS, INC.

v.

KEVIN HUBER; INSYSMA (Integrated Systems and
Machinery, LLC);
LIVINGSTON & HAVEN LLC; CLIFTON B. VANN, IV;
THOMAS AUFIERO

Livingston & Haven, LLC; Clifton B. Vann, IV; Thomas
Aufiero,
                                    Appellants in No.
                19-1722

Kevin Huber; INSYSMA,
                                    Appellants in No.
                19-1752
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 1-13-cv-03087)
District Judge:  Hon. Christopher C. Conner

_____

Argued
January 15, 2020

Before:   JORDAN, GREENAWAY, JR., and KRAUSE,
*Circuit Judges.*

(Filed: April 30, 2020)
_____

Ronald L. Hicks, Jr.   [ARGUED]
Carolyn B. McGee
Porter Wright Morris & Arthur
6 PPG Place – 3rd Fl.
Pittsburgh, PA   15222
         *Counsel for Appellants Livingston & Haven, LLC;*
         *Clifton B. Vann, IV; Thomas Aufiero*

Jonathan Z. Cohen
Conrad O'Brien
1500 Market Street
West Tower, Ste. 3900
Philadelphia, PA   19102
         *Counsel for Appellants Kevin Huber and*
         *INSYSMA (Integrated Systems and Machinery, LLC)*

David G. Concannon
200 Eagle Road – Ste. 116
Wayne, PA   19087

2

Zahra R. Dean
Robert J. LaRocca   [ARGUED]
Kohn Swift & Graf
1600 Market Street – Ste. 2500
Philadelphia, PA   19103
        *Counsel for Appellee*

———————————

OPINION OF THE COURT
———————————

JORDAN, *Circuit Judge*.

This sorry story of disloyalty and deception piled upon deception resulted in verdicts against the wrongdoers.  They're not happy about that, but, when the tale is told, it's clear that the result is entirely justified.  In brief summary, Kevin Huber stole confidential information from his employer Advanced Fluid Systems, Inc. ("AFS"), first for the benefit of an AFS competitor, Livingston & Haven, LLC ("Livingston"), with whom Huber wanted to ingratiate himself, and then, in another twist of deceit, for a company he created, Integrated Systems and Machinery, LLC ("INSYSMA"; together with Huber, the "Huber Parties"), to compete against both AFS and Livingston.  When the facts began to come to light, AFS brought suit against the Huber Parties and Livingston, as well as Livingston employees Clifton B. Vann IV and Thomas Aufiero (together with Livingston, the "Livingston Parties"), alleging various claims under federal and state law, including principally trade secret misappropriation claims under the Pennsylvania Uniform Trade Secrets Act (the "Trade Secrets Act" or the "Act").  There was one other defendant, Orbital Sciences Corporation ("Orbital"), the company from which AFS,

3

Livingston, and INSYSMA were all trying to get business. AFS settled with Orbital before trial, and it is not one of the Appellants here. All of the other defendants are.

On summary judgment, the District Court held as a matter of law that the Huber Parties were liable under the Trade Secrets Act for misappropriating AFS's trade secrets. Then, following a bench trial, the Court held the Livingston Parties jointly and severally liable with the Huber Parties for that misappropriation, and it held all Appellants except Aufiero and INSYSMA liable for breach of fiduciary duty or aiding and abetting that breach. As remedies for the tortious conduct, the Court awarded compensatory damages from all Appellants, exemplary damages under the Act from Huber, and, based on the breach of fiduciary duty, punitive damages from all Appellants except INSYSMA and Aufiero.[1]

---

[1] The terms "exemplary damages" and "punitive damages" are synonymous, see Damages, Black's Law Dictionary (11th ed. 2019) (noting punitive damages are "[a]lso termed *exemplary damages*"), but the Trade Secrets Act uses the former term while common law causes of action tend to invoke the latter. *See* 12 Pa. Const. Stat. § 5304(b) (permitting court to award "exemplary damages" if "willful and malicious misappropriation exists"); *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 773 (Pa. 2005) ("This Court found that an award of punitive damages was proper for claims sounding in breach of fiduciary duty, as well as intentional withholding of information and fraudulent misrepresentation.").

4

Appellants bring a host of issues to us. Their central argument, however, is that AFS's claim for trade secrets misappropriation must fail because AFS does not "own" the purported trade secrets at issue. Beyond their core grievance, Appellants also attack the District Court's rulings that the claimed trade secrets are actually protectable under the Trade Secrets Act, that the Livingston Parties were not prejudiced by their counsel's conduct at and following the trial, and that the damages awards were warranted. In a thorough opinion, the District Court properly rejected Appellants' ownership argument on the ground that the Act only requires that a plaintiff lawfully possess the trade secrets it wishes to vindicate. In similarly persuasive decisions, the Court dismissed Appellants' various remaining challenges as inconsistent with the record, untimely, legally deficient, or some combination thereof. We agree with all of those conclusions and will affirm the Court's rulings and judgment in their entirety.

I. **BACKGROUND**[2]

A. **Factual Background**

"AFS distributes, manufactures, and installs hydraulic components and hydraulic systems" that use pressurized fluids

---

[2] We derive this factual summary primarily from the District Court's post-trial findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous …."); *Newark Branch, N.A.A.C.P. v. City of Bayonne*, 134 F.3d 113, 119 (3d Cir. 1998) ("In a bench trial, the court shall find the facts and state separately its conclusions

to move heavy machinery for complex operations and engineering projects. *Advanced Fluid Sys., Inc. v. Huber*, 295 F. Supp. 3d 467, 470 (M.D. Pa. 2018) (hereinafter, "*Post-Trial Op.*"). Huber was employed at AFS as a full-time sales engineer between November 2006 and October 2012. Livingston is a competitor of AFS's and designs, assembles, and installs hydraulic fluid systems. Vann is the chief executive officer of Livingston's holding company and Livingston's president. Aufiero worked at AFS from 1989 through January 2011, when he left to become a regional sales manager at Livingston.

In September 2009, AFS entered into a three-year contract with the Virginia Commonwealth Space Flight Authority (the "Space Flight Authority" or the "Authority") to build, install, and maintain a hydraulic system for the NASA rocket launch facility on Wallops Island, Virginia. From that

---

of law thereon and those [f]indings of fact ... shall not be set aside unless clearly erroneous.") (internal quotation marks omitted and alteration in original). With respect to the facts pertinent to the District Court's decision on summary judgment, we view them in the light most favorable to the non-moving parties, *see Lawrence v. City of Philadelphia*, 527 F.3d 299, 310 (3d Cir. 2008) ("It is well established that [on summary judgment] the court must view all evidence and draw all inferences in the light most favorable to the non-moving party .… The rule is no different where there are cross-motions for summary judgment."), though that is still highly unflattering for Appellants. Our summary of the procedural history draws from the entire record, including the District Court's memorandum resolving the parties' post-judgment requests for relief.

island, Orbital launches its Antares rocket, employing the hydraulic system designed and installed by AFS. The Antares rocket services and supplies the International Space Station. Huber was intimately involved in the development of the Wallops Island hydraulic system, eventually becoming its "*de facto* project manager[.]" *Id.* at 473.

AFS supplied the Space Flight Authority with a comprehensive package of engineering drawings generated during the design and installation of the hydraulic system. Pursuant to the contract (the "Agreement") between AFS and the Authority, all materials generated during performance of the Agreement were to be deemed "work for hire" and the "exclusive property" of the Authority. *Advanced Fluid Sys., Inc. v. Huber*, No. 1:13-CV-3087, 2017 WL 2445303, at *2 (M.D. Pa. June 6, 2017) (hereinafter, "*Summary Judgment Op.*"). All drawings that AFS delivered to the Authority pursuant to the Agreement included an AFS title block with a confidentiality stamp. In tension with the ownership stipulation in the Agreement, the confidentiality stamp read: "This drawing discloses propriety and confidential data of Advanced Fluid Systems, Inc., and may not be used disclosed or released, in whole or in part, for any purpose outside the authorized recipient, without signed authorization, and must be returned upon request." *Post-Trial Op.*, 295 F. Supp. 3d at 484.

In September of 2012, the Space Flight Authority experienced financial difficulty. As a result, Orbital acquired control of the launch system, including the hydraulic system that AFS had designed and manufactured. AFS did not execute a non-disclosure agreement with Orbital, but Orbital maintained a practice of only disclosing AFS's drawings on a need-to-know basis.

7

Around this same time, Huber, while still working for AFS, began communicating with the Livingston Parties about the Wallops Island hydraulic system. He claimed that Orbital was unhappy with AFS and was seeking new vendors to service the system. He also took affirmative steps to help the Livingston Parties familiarize themselves with the system and, more generally, with Orbital's operations on Wallops Island. He arranged tours and began sending the Livingston Parties various confidential AFS internal documents and engineering drawings. To communicate with Huber, the Livingston Parties created a commercial Dropbox folder, installed a virtual private network on Huber's AFS laptop, and provided him with a Livingston email address.

Orbital did eventually seek bids with respect to two aspects of the hydraulic system: a "gripper arms replacement" project and a "cylinder upgrade" project. Regarding the gripper arms contract, Huber, while still employed by AFS, worked closely with the Livingston Parties to prepare a bid. At the same time, he was also playing a key role in the bid presented by AFS, which he succeeded in inflating by over $130,000 to ensure that Livingston's bid was more competitive. Not surprisingly, Livingston was awarded the gripper arms contract. During the ensuing design process, Livingston's team relied extensively on confidential engineering drawings that AFS had created and Huber stole.

As to the cylinder upgrade project, Huber again stacked the deck against AFS by failing to disclose key information about what Orbital was looking for, encouraging AFS to submit a bid only for Orbital's non-preferred option, and by working with the Livingston Parties to develop a proposal

based on confidential AFS documents that, again, he had provided.

In October 2012, Huber's penchant for deceit led to another twist. Unbeknownst to Livingston or AFS, he formed his own business entity, INSYSMA, intending to submit a competing bid for the cylinder upgrade contract. That same month, he downloaded nearly 98 gigabytes of AFS's proprietary files to an external hard drive, including its engineering drawings, bills of materials, and other documents for the hydraulic system, documents pertaining to AFS's gripper arms quote, and all of its pending and past project files dating back to 1993. He then tendered his notice of resignation to AFS.

Following his resignation, Huber continued to work with Livingston on its gripper arms design and its cylinder assembly bids, sharing with the Livingston team many of the files he had taken from AFS. Livingston's preparatory efforts and eventual bids relied heavily on drawings generated by AFS in the design of the Wallops Island hydraulic system, as well as other insider knowledge gathered from Huber. Eventually, and to the Livingston Parties' great surprise, Orbital awarded the cylinder contract to neither AFS nor Livingston but to INSYSMA.

## B. Procedural History

"AFS commenced this action on December 24, 2013, initially naming Huber, [INSYSMA], Livingston, Vann, Aufiero, and Orbital as defendants." *Advanced Fluid Sys., Inc. v. Huber*, 381 F. Supp. 3d 362, 370 (M.D. Pa. 2019) (hereinafter, "*Post-Judgment Op.*"). AFS and Orbital reached

9

a settlement agreement pursuant to which AFS dismissed Orbital from the lawsuit in exchange for Orbital's agreement to grant AFS a subcontract for certain work on the hydraulic system. The settlement agreement, which does not identify Orbital as a joint-tortfeasor with Appellants, explicitly states that "no money is being paid" by Orbital pertaining to items of damages asserted by AFS against Appellants in this case. (App. at 2222.)

The claims that AFS asserted under federal law were either all dismissed or abandoned through motions practice and amended pleadings. Ruling on motions to dismiss, the District Court determined that AFS had standing[3] to assert trade secret misappropriation claims under Pennsylvania law against Appellants because AFS had adequately alleged lawful possession of the relevant trade secrets and "that ownership, in the traditional sense, is not prerequisite to a trade secret misappropriation claim." *Advanced Fluid Sys., Inc. v. Huber*, 28 F. Supp. 3d 306, 323 (M.D. Pa. 2014) (hereinafter, "*MTD Op.*"). Later, on summary judgment, the Court concluded as a matter of law that the information at issue qualified as trade

---

[3] The District Court recognized that the standing issue here is one of statutory standing, which requires "determin[ing], using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014); *cf. Commw. of Pa. v. Janssen Pharma.*, 8 A.3d 267, 275 (Pa. 2010). Here, the question is whether ownership of the trade secret is an element of a claim for misappropriation under the Act.

secrets and that the Huber Parties were liable under the Trade Secrets Act for misappropriating it.

The District Court convened a six-day bench trial on AFS's remaining claims, specifically the claims for trade secret misappropriation against the Livingston Parties, and the claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty. At trial, the Livingston Parties were represented by Philip J. Morin, Esquire, of the law firm Florio Perrucci Steinhardt & Fader, LLC. Morin and his firm were chosen by Livingston's insurer. During the trial, Morin informed the Court, on the record at a side bar, that he was not admitted to practice before it. He also disclosed his disciplinary history, including a public reprimand in New Jersey and a reciprocal suspension imposed by New York in 2015. In response to the Court's question of whether he was then "credentialed and fully admitted in both jurisdictions," Morin stated that he "was authorized to practice in New Jersey but that New York required him to file a motion for reinstatement, which was pending." *Post-Judgment Op.*, 381 F. Supp. 3d at 371. The Court instructed Morin to file the appropriate paperwork and permitted him to continue to represent the Livingston Parties at trial without further discussion.

After the trial, the Court issued an order directing the parties to file proposed findings of fact and conclusions of law within 30 days of receiving the official transcript, which deadline the parties later extended by stipulation, with the Court's approval. AFS and the Huber Parties timely filed their respective post-trial submissions, but the Livingston Parties never filed any, nor did they request an extension of time to do

11

so. Morin did not disclose to the Livingston Parties that he had missed the filing deadline.

In its post-trial findings of fact and conclusions of law, the Court found that the Livingston Parties were liable for misappropriating AFS's trade secrets, that Huber had breached a duty of loyalty to AFS, and that Livingston and Vann, but not Aufiero, aided and abetted that breach. The Court awarded AFS compensatory damages from all Appellants, based on lost profits, exemplary damages under the Act against Huber alone for his trade secret theft, and punitive damages against Huber, Livingston, and Vann, jointly and severally, stemming from Huber's breach of fiduciary duty.

Appellants then filed scattershot post-trial motions invoking subsections of Federal Rules of Civil Procedure 52, 59, and 60, claiming, among other objections, that: (i) the Livingston Parties were entitled to a new trial because of the misconduct and negligence of their insurer-retained counsel; (ii) the evidence did not support a punitive damages award against the Livingston Parties; (iii) the District Court incorrectly failed to reduce its compensatory damages award by the amount of AFS's settlement with Orbital; and (iv) certain additional costs were improperly excluded from the District Court's lost-profits analysis. After thorough analysis, the Court denied the post-trial motions in their entirety. This timely appeal followed.

## II. DISCUSSION[4]

### A. AFS's Trade Secret Misappropriation Claims[5]

The first and predominant issue in this appeal is whether AFS, by virtue of its Agreement with the Space Flight Authority – a contract that explicitly designates the confidential information at issue in this case as the Authority's "exclusive property" – can maintain a trade secret misappropriation claim under Pennsylvania law. Appellants argue that AFS cannot, for three reasons: first, AFS does not "own" the claimed trade secrets; second, even if the Trade Secrets Act does not require ownership as a prerequisite for standing to sue, AFS still lacks standing because it did not "lawfully possess" the trade secrets; and, third, what AFS argues are trade secrets cannot properly be designated as such because inadequate measures were taken to ensure their continued secrecy. None of those positions is persuasive.

---

[4] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332. We have jurisdiction under 28 U.S.C. § 1291.

[5] We exercise *de novo* review over the District Court's legal determinations that fee simple ownership of a trade secret is not a prerequisite to a misappropriation claim under the Trade Secrets Act and that AFS had protectable trade secrets as a matter of law. *See Simpson v. Att'y Gen.*, 913 F.3d 110, 113 (3d Cir. 2019) (summary judgment); *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 266 (3d Cir. 2014) (standing).

In a closely reasoned opinion, the District Court considered what interest a plaintiff must have in a trade secret to have standing under the Trade Secrets Act to bring an action for misappropriation. After examining the text of the Act and surveying cases from other jurisdictions that have adopted some version of the Uniform Trade Secrets Act, the District Court explained why it is appropriate to follow the reasoning set forth in *DTM Research, L.L.C. v. AT & T Corp.*, 245 F.3d 327 (4th Cir. 2001).

In *DTM*, the United States Court of Appeals for the Fourth Circuit held that a party asserting a misappropriation claim under Maryland's Uniform Trade Secrets Act need only demonstrate lawful possession of a trade secret, and not "ownership in its traditional sense[,]" to maintain such a claim. *DTM*, 245 F.3d at 333. That holding was based on the premise that "[t]he proprietary aspect of a trade secret flows, not from the knowledge itself, but from its secrecy[,]" because "[i]t is the secret aspect of the knowledge that provides value to the person having the knowledge. … While the information forming the basis of a trade secret can be transferred, as with personal property, its continuing secrecy provides the value, and any general disclosure destroys the value." *Id.* at 332 (internal quotation marks omitted).

In other words, while ownership of the sort traditionally associated with real or personal property is sufficient to maintain a trade secret misappropriation claim because the complete bundle of rights related to trade secrets includes the right to enjoy the value of the information's secrecy, it is not a necessary condition. A *per se* ownership requirement for misappropriation claims is flawed since it takes account neither of the substantial interest that lawful possessors of the secrets

14

have in the value of that secrecy, nor of the statutory language that creates the protection for trade secrets while saying nothing of ownership as an element of a claim for misappropriation.

Although *DTM* involved Maryland's version of the Uniform Trade Secrets Act, we, like the District Court, agree with the Fourth Circuit's cogent explanation of why lawful possession of a trade secret can, under circumstances like this, be sufficient to maintain a misappropriation claim, even absent ownership. The relevant language of the Act, which on its face lacks any ownership requirement, is functionally identical to that of its Maryland counterpart.[6] And, while *DTM*'s rationale rejects the notion that trade secrets are just like tangible property, it still rests on the premise that trade secrets are a species of property, a view entirely consistent with Pennsylvania's common law prior to the enactment of its version of the uniform act. *See Heraeus Med. GmbH v. Esschem, Inc.*, 927 F.3d 727, 738 (3d Cir. 2019) ("Pennsylvania courts have adopted the 'property' view of trade secrets, under which the basis of a claim for trade secret

---

[6] In addition, as the District Court correctly recognized, "[n]either the commentary to the uniform law nor [the Trade Secrets Act]'s legislative history include[s] any specific reference to legal ownership of the trade secrets as a prerequisite to a cause of action." *MTD Op.*, 28 F. Supp. 3d at 318. On the contrary, as a leading treatise recognizes, "because the gravamen of [a Uniform Trade Secrets Act] misappropriation action is wrongful acquisition or improper use of information gained from a plaintiff, *possession*, as opposed to *ownership*, suffices." 4 Roger M. Milgrim & Eric E. Bensen, *Milgrim on Trade Secrets* § 15.01 (2020).

15

misappropriation is the violation of a property right[.]"). Again, the point is not that ownership is irrelevant. The point is that it is not the sole kind of interest that is relevant and subject to protection. Appellants' briefing is devoid of any serious challenge to *DTM*'s reasoning.[7] Their argument, such as it is, lacks merit, and we reject it.

---

[7] The Huber Parties merely note that the District Court was the first Pennsylvania court, state or federal, to follow *DTM* and that a district court in the Western District of Pennsylvania had held that a non-owner could not pursue a trade secret claim under Pennsylvania law. Huber Parties' Opening Br. at 24 (citing *Transp. Compliance Assocs. Inc. v. Hammond*, No. 2:11-CV-1602, 2012 WL 1435445, at *3 (W.D. Pa. Apr. 25, 2012), *modified on reconsideration*, 2012 WL 8017416 (W.D. Pa. May 3, 2012)). We are not troubled that the District Court was the first to follow *DTM*, particularly since it appears to be the first Pennsylvania court to actually analyze whether Pennsylvania law includes an "ownership" requirement. For example, and as the District Court observed, *Hammond* "cursorily adopts an ownership approach without any discussion of the nature of trade secrets or the source of their value[,]" and, in support of that approach, relies entirely on a case that "did not turn on an ownership inquiry[.]" *MTD Op.*, 28 F. Supp. 3d at 322 n.8. Other cases Appellants have relied on and that appear to adopt an ownership requirement were decided before adoption of the Trade Secrets Act and similarly lack any meaningful analysis of the ownership issue. More significantly, they address the issue of whether the party claiming misappropriation owned a trade secret, not the distinct question of whether other interests, such as lawful possession, can be sufficient to sustain a claim. *See, e.g., Gruenwald v. Advanced Comput. Applications, Inc.*, 730 A.2d

16

Appellants' second contention, that AFS did not lawfully possess the information it claims as trade secrets, is similarly unavailing. The gist of this argument is that the transfer of rights to the trade secrets effectuated by the Agreement included the transfer of any right to possess those trade secrets, thereby foreclosing AFS from lawfully possessing them. But that ignores the uncontroverted record that AFS not only physically retained possession of the drawings and other information constituting the trade secrets; it also was required to use, and in fact did use, those trade secrets to fulfill its obligations under the Agreement and in contracts that AFS and Orbital entered into after the Agreement. Moreover, despite necessarily being aware that AFS physically retained and was using the trade secrets to fulfill its contractual obligations, the "owner"[8] of those secrets never once objected to, or even so much as questioned, AFS's retention or use of those secrets. It did not even push back when AFS affixed to documents containing the secrets a

_____

1004, 1012–13 (Pa. Super. Ct. 1999) (analyzing whether former employee retained "ownership" of technologies he created during scope of employment with former employer); *Varo, Inc. v. Corbin Mfg. Co.*, 50 F.R.D. 376, 378 (E.D. Pa. 1970) (noting "[m]ere possession is insufficient to establish the fact of ownership" where "Plaintiff's sole position is that the defendant corporation is not the owner of the trade secrets").

[8] Because AFS states in its brief that it "conveyed legal title to its work product to the [Authority]," Appellee's Br. at 47, we need not opine on any residual ownership interest it might otherwise claim and will treat the Authority as the owner.

17

confidentiality notice asserting that AFS had an ownership interest in them.

Ownership of a trade secret – or any intellectual property for that matter – undoubtedly imbues the owner with the authority to give others lawful possession, including by merely consenting to that possession. Such possessory rights were given to AFS, even if a full ownership interest was not. The course of conduct evident in the record shows that AFS clearly had permission to hold and use the secrets. True, had the Agreement contained an explicit license for AFS's benefit, any dispute about lawful possession could have been avoided. *See Metso Minerals Indus. v. FLSmidth-Excel LLC*, 733 F. Supp. 2d 969, 971–72 & n.4 (E.D. Wis. 2010) (holding non-exclusive license to use trade secrets at issue constituted "lawful possession" of that information). But Appellants cite no authority for the proposition that one who retains and uses a trade secret owned by another for that owner's benefit, with that owner's knowledge, and, at a minimum, with that owner's implied consent, does not lawfully possess that trade secret.[9] We decline to adopt such a counter-intuitive rule of law.

---

[9] In that regard, the District Court correctly distinguished *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co.*, No. CIV. 09-00181 DAE-KSC, 2011 WL 2116989 (D. Haw. May 25, 2011), *aff'd*, 531 F. App'x 784 (9th Cir. 2013). In that case, the court held that the plaintiff could not sustain a misappropriation claim because it had "transferred, without reservation, all of the relevant confidential information and trade secrets" pursuant to an agreement. *Id.* at *21. Unlike the plaintiff in *BlueEarth*, however, AFS "remains in possession of and continues to use the trade secrets." *MTD Op.*, 28 F. Supp. 3d at 323.

18

Finally, Appellants urge that the District Court erred in holding as a matter of law that the claimed trade secrets are protectable under the Trade Secrets Act. They say that, at a minimum, there was a genuine dispute of material fact regarding the reasonableness of the measures taken to ensure the secrecy of the information at issue. More particularly, Appellants point to the fact that the information was provided by AFS to the Space Flight Authority, a public entity subject to a state open-records law, without a formal non-disclosure or confidentiality agreement. On the summary judgment record before us, however, we are not persuaded that a reasonable trier of fact could find that AFS's interactions with the Authority, or with Orbital, extinguished AFS's protectable interest in the trade secrets.

Consistent with its approach throughout this lengthy litigation, the District Court fully explained its rationale for concluding that AFS could claim trade secret protection as a matter of law, applying the six-part framework that Pennsylvania courts adopted from the Restatement First of Torts § 757.[10] *See Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010) (citing *Crum v. Bridgestone/Firestone N. Am. Tire, LLC*, 907 A.2d 578, 585

---

[10] As we noted in *Bimbo Bakeries*, although [the Act] "displaced Pennsylvania's common law tort for misappropriation of trade secrets, [] there is no indication that the statute effected a substantive shift in the definition of trade secret." 613 F.3d at 109 n.7 (internal quotation marks and citation omitted).

19

(Pa. Super. Ct. 2006)).[11]  As part of its analysis, the Court explained that the Space Flight Authority "honored AFS's proprietary designation and did not disclose its information except as needed for operation of the [Wallops Island] Hydraulic System."  *Summary Judgment Op.*, 2017 WL 2445303, at \*11.

Based on our own review of the record, we agree with that assessment.  The record shows that, even if the Authority did not contractually bind itself to do so, it nevertheless believed it had an obligation to preserve the confidentiality of AFS's designs, and at all relevant times it conducted itself in a manner consistent with that belief.

Appellants' assertions regarding the Authority's theoretical freedom to disclose AFS's trade secrets, pursuant to Virginia's open records law or otherwise, are entirely speculative.  They cite no evidence that the Authority failed to take reasonable steps to ensure the confidentiality of the trade secrets, or that it ever did disclose those secrets to anyone to whom disclosure was not essential for the development or maintenance of the Antares launch system at Wallops Island.  Similarly, Appellants cite no evidence that the Authority was

---

[11]  The District Court found that only the second factor, which addresses the extent to which AFS employees were privy to its confidential information, militated against trade secret status because AFS employees were not required to sign confidentiality agreements.  We agree with the District Court that, under the specific facts of this case, this single factor does not raise a genuine dispute of material fact as to whether AFS possessed trade secrets as a matter of law because the other five factors weigh decisively in the opposite direction.

20

ever actually subject to a records request relating to AFS's trade secrets, that the probability of such a request was anything more than extremely remote, or how the Authority may have handled such a request if one were made. Indeed, conspicuously absent from the record is any hint as to why, if AFS's trade secrets were so readily obtainable from the Space Flight Authority, Appellants felt it necessary to engage in a coordinated, clandestine campaign of tortious conduct to obtain them.

Therefore, we are in accord with the District Court's conclusion that Appellants failed to raise a genuine dispute of material fact as to whether the confidential drawings and other information that they had a hand in stealing were not in fact and in law trade secrets. Appellants' arguments opposing AFS's trade secrets misappropriation claims thus fail.[12]

### B.    Conduct of Livingston Parties' Counsel[13]

The Livingston Parties take issue with the District Court's denial of their request for a new trial based on the

---

[12]    The Livingston Parties also argue that AFS cannot bring a misappropriation claim because it "did not stand to incur a loss if the trade secrets were misappropriated[.]" Livingston Parties Reply Br. at 9. That argument, raised for the first time in a reply brief, is forfeited. *Haberle v. Borough of Nazareth*, 936 F.3d 138, 141 n.3 (3d Cir. 2019).

[13]    The District Court denied the Livingston Parties' motion for a new trial made pursuant to Federal Rules of Civil Procedure 59(a)(1)(B), 60(b)(1), 60(b)(3), and 60(b)(6). We review that denial for abuse of discretion. *See Lazaridis v.*

conduct of their lead trial counsel, Mr. Morin. Shortly following the entry of judgment against them, the Livingston Parties discovered that Morin had failed to gain formal authorization to practice before the District Court and also had failed to submit any post-trial proposed findings of fact and conclusions of law. According to the Livingston Parties, the first failure amounted to a fraud on the Court and the second to "excusable neglect," both of which should entitle them to a new trial. The District Court addressed those arguments in full and properly rejected them.

First, the Livingston Parties complain that Morin represented them at trial despite never being admitted *pro hac vice*, thereby violating the District Court's Local Rules and engaging in the unauthorized practice of law. In so complaining, however, they fail to address – in fact, they simply ignore – our precedent regarding the application of local rules.

"[A] district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment." *United States v. Eleven Vehicles, Their Equip. & Accessories*, 200 F.3d 203, 215 (3d Cir. 2000). The District Court had a sound

*Wehmer*, 591 F.3d 666, 669 (3d Cir. 2010) (Rule 59); *Budget Blinds, Inc. v. White*, 536 F.3d 244, 251 (3d Cir. 2008) (Rule 60). "[A] court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 780 (3d Cir. 2001) (quotation marks and citation omitted).

rationale for overlooking Morin's technical non-compliance: it already had sufficient information to determine whether he should be admitted to practice *pro hac vice*, and it did not wish to further delay a case that was ready for trial and had taken four years to get to that point. Moreover, the District Court correctly explained that the Livingston Parties could not have relied to their detriment on the District Court's Local Rules regarding *pro hac vice* admissions because the "essential purpose" of those rules is to assist the Court, not to "protect an interest of the parties." *Post-Judgment Op.,* 381 F. Supp. 3d at 380–81.

Under the circumstances, the District Court did not abuse its discretion by refusing the Livingston Parties' request to grant the extraordinary relief of a new trial, particularly since Morin's non-compliance with the District Court's Local Rules was essentially technical, not substantive, in nature. Everyone in the case, including the Livingston Parties, knew of Morin's role in the litigation and accepted it. [14]

Still pressing the point, however, the Livingston Parties say that Morin perpetrated a fraud on the District Court and on them by misleading the Court about the discipline he was subject to in New York, by failing to advise them of his disciplinary history and inability to practice before the Court,

---

[14] At least through the trial, the Livingston Parties seem to have been satisfied. They fail to identify a single thing Morin did or failed to do during the trial itself that prejudiced them. *Cf. Post-Judgment Op.*, 381 F. Supp. 3d at 371–72 (noting that Morin "zealously represented" the Livingston Parties at trial, made a "well stated" Rule 52(c) motion on their behalf and contributed to the case being "well tried[.]").

23

and by "using Pennsylvania licensed attorneys who were never known by the Livingston Parties to have entered an appearance on their behalf." Livingston Parties Opening Br. at 28. As for the first and third of those assertions, the record is plainly to the contrary. The District Court pointed out that Morin had disclosed his suspension from practicing law in New York, and that there was a pending motion for his reinstatement in that jurisdiction. Those disclosures were accurate in all relevant respects and were not misleading. And it is certainly not believable that the Livingston Parties were unaware that other attorneys at Morin's firm had entered appearances on their behalf. Those other attorneys were present and assisted during depositions, pretrial proceedings, and trial, and they had signed the Livingston Parties' pretrial pleadings and motions.

Regarding the Livingston Parties' contention that Morin defrauded them by not disclosing his disciplinary status, the District Court did not abuse its discretion in determining that Morin did not commit a fraud. The Court determined that his conduct was, by all appearances, based on a "mistaken but good faith belief that reinstatement in New York would be a routine matter[.]" *Post-Judgment Op.*, 381 F. Supp. 3d at 375. Nor did the District Court abuse its discretion by declining to grant the Livingston Parties a new trial based on their own counsel's purported failure to fully disclose his disciplinary history to them. The Livingston Parties bear the responsibility for knowing who represents them. It does not matter that Morin was chosen by their insurer.

We do not minimize the seriousness of Morin's failure to file post-trial submissions to summarize the Livingston Parties' legal positions. But any harm those parties suffered from the absence of those submissions was mitigated by the

24

Court's awareness of the arguments they say should have been advanced. Indeed, the arguments had largely been advanced in one form or another over the course of the drawn-out proceedings. As the District Court noted, a detailed pretrial submission was filed and "raised many of the arguments that the Livingston defendants now claim, through new counsel, that Attorney Morin failed to present to the court." *Post-Judgment Op.*, 381 F. Supp. 3d at 376 n.6. And, of course, the parties' positions on various issues were evident through the course of trial. The District Court expressly disclaimed that Morin's failure to file a post-trial submission altered the outcome of this case, and the Court's extensive efforts to independently assess the merits of AFS's claims and anticipate and address the Livingston Parties' well-known arguments, despite the lack of post-trial briefing from those parties, is apparent on the face of both the Court's Post-Trial and Post-Judgment Opinions. For example, rather than simply adopt positions advocated by AFS, the Court after careful analysis declined to find that the Livingston Parties' involvement in trade secret misappropriation was willful or malicious, or that Aufiero was liable to AFS for punitive damages.

Finally, the Livingston Parties maintain that Morin's failure to file post-trial briefing constitutes "excusable neglect" entitling them to a new trial. The District Court, consistent with our precedent, faithfully balanced the four relevant factors established by the Supreme Court in *Pioneer Investment Services Co. v. Brunswick Associates. Ltd. Partnership*, 507 U.S. 380 (1993),[15] for determining whether excusable neglect

---

[15] The four factors are: "the danger of prejudice to the [non-movant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including

warrants setting aside a final judgment. It explained why the balance in this case fell decidedly against doing so. Specifically, the Court found that AFS would endure considerable prejudice by having to retry the case, because even a timely post-trial submission from Morin would not have changed the outcome of the case. Moreover, a new trial would constitute a "disruption to efficient judicial administration," given the substantial time and resources the Court had already dedicated to the matter. *Post-Judgment Op.*, 381 F. Supp. 3d at 377. The Court also found that the failure to submit post-trial briefing was not "excusable," notwithstanding the personal difficulties Morin was dealing with at the time, because, among other reasons, the Livingston Parties had several other attorneys listed as counsel of record, all of whom

_____

whether it was within the reasonable control of the movant, and whether the movant acted in good faith." *Id.* at 395. As the District Court noted, because it independently reached and assessed the merits of this case, irrespective of the lack of post-trial briefing from the Livingston Parties, there is an argument to be made that Morin's failure to file post-trial briefing does not implicate the "excusable neglect" standard contemplated by Federal Rule of Civil Procedure 60(b)(1). Because we agree with the District Court that the Livingston Parties are not entitled to relief under Rule 60(b)(1), even assuming it applies, we do not reach the question of whether a party can claim excusable neglect when a district court independently adjudicates an issue on the merits, notwithstanding that party's failure to make a relevant filing.

26

could have and should have been aware of the post-trial briefing deadline.[16] *Id.* at 377–78.

We discern no abuse of discretion in the District Court's analysis, all of which is well supported by the record and consistent with governing legal principles. While problems associated with Morin's representation of the Livingston Parties may give rise to claims in another tribunal, the Court here acted well within its discretion in determining that any flaws in the representation did not entitle the Livingston Parties to the extraordinary relief of a new trial.

### C. Punitive Damages Award Against Vann and Livingston[17]

In the next issue presented for review, Vann and Livingston contend that the District Court erred in awarding

---

[16] For that same reason, we reject the Livingston Parties' argument that they were "effectively abandoned" by counsel. Livingston Parties' Opening Br. at 35. There is no support for the assertion that Morin was the only attorney responsible for their case, or that the other attorneys who entered an appearance on their behalf were incapable of representing their interests.

[17] "Review of the District Court's damages calculation is a mixed question of law and fact." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 293 (3d Cir. 2014). We accept the District Court's findings of fact unless clearly erroneous, but exercise plenary review over the Court's choice, interpretation, or application of legal principles. *Id.*

punitive damages against them both because the record lacks evidence that their conduct was egregious enough to justify the imposition of such damages and because the District Court incorrectly relied on their lack of remorse. Again, we are unpersuaded.

It is patently incorrect to say that the record lacks enough evidence to sustain an award of punitive damages against Vann and Livingston. The District Court noted that Vann approved a compensation package for Huber that incentivized Huber to do damage to AFS, when Vann well knew that Huber remained within AFS's employ and that he was "working directly against AFS's interests" by "attempting to steer business toward Livingston and away from AFS[.]" *Post-Judgment Op.*, 381 F. Supp. 3d at 387–88. Moreover, the compensation package that Vann approved for Huber was just one aspect of Vann's "continued engagement and communication with, and encouragement of, Huber,"[18] despite Vann's claiming to have been "alarmed" by the fact that "Huber was working on behalf of both AFS and Livingston contemporaneously[.]" *Id.* at 387. Given Vann's actual knowledge of Huber's attempts to move business from AFS to Livingston and of the wrongfulness of Huber's actions,[19] the

---

[18] Examples include attending in-person meetings with Huber and Vann's knowledge that "as early as February that Livingston employees were sharing documents on Dropbox and collaborating with Huber." *Post-Trial Op.*, 295 F. Supp. 3d at 490.

[19] As an executive himself, Vann knew and "expressly confirmed his understanding of an employee's duty of loyalty to their employers." *Post-Trial Op.*, 295 F. Supp. 3d at 490.

28

Under Pennsylvania law, employees, in addition to officers or directors, may owe their employers fiduciary duties. *See AmQuip Crane Rental, LLC v. Crane & Rig Servs., LLC*, 199 A.3d 904, 915 (Pa. Super. Ct. 2018) (salesman breached duty of loyalty to employer by helping co-workers breach their noncompetition agreements with employer); *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 211 (Pa. Super. Ct. 2003) (radio station manager breached duty of loyalty to employer by not enforcing noncompetition agreements); *see also Solid Wood Cabinet Co. v. Partners Home Supply*, Civil Action No. 13-3598, 2015 WL 1208182, at *6 (E.D. Pa. Mar. 13, 2015) ("Pennsylvania law dictates that employees owe their employers a duty of loyalty."); *Synthes, Inc. v. Emerge Med., Inc.*, 25 F. Supp. 3d 617, 667 (E.D. Pa. 2014) (same); *Crown Coal & Coke Co. v. Compass Point Res., LLC*, Civil Action No. 07-1208, 2009 WL 891869, at *5 (W.D. Pa. Mar. 31, 2009) ("Under Pennsylvania law, an employee is an agent of his employer and owes his employer a duty of loyalty."). Relatedly, confidential relationships also can give rise to fiduciary duties under Pennsylvania law. "[T]he essence of [a confidential] relationship is trust and reliance on one side, and a corresponding opportunity to abuse that trust for personal gain on the other. Accordingly, [a confidential relationship] appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, *or*, on the other, weakness, dependence or trust, justifiably reposed[.]" *PTSI, Inc. v. Haley*, 71 A.3d 304, 311 (Pa. Super. Ct. 2013) (quoting *Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 218 (Pa. Super. Ct. 2012)) (alterations in original). Here, the record plainly shows that Huber acted as AFS's agent, and that they shared a confidential relationship in that AFS trusted Huber, and was

record easily supports the inference that Vann and the company he led, Livingston, appreciated that their continued encouragement and facilitation of Huber's misdeeds would directly result in harm to AFS. The record also supports the inference that their decision to nevertheless encourage and facilitate Huber's wrongdoing in the face of that known harm was at the very least recklessly indifferent to AFS's rights.

Under Pennsylvania law, such conduct can support a punitive damages award. *See, e.g., Hutchison ex rel. Hutchison v. Luddy,* 870 A.2d 766, 770 (Pa. 2005) (explaining that punitive damages may be awarded where conduct is "outrageous" because of "reckless indifference to the rights of others[,]" and the conduct at issue was "intentional, reckless or malicious") (citations and quotation marks omitted); *SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 705 (Pa. 1991) (upholding punitive damages award where employee deliberately diverted contract to new employer during his last week of employment with previous employer). Thus, Vann's and Livingston's argument that the punitive damages award entered against them lacks adequate factual support is wholly unpersuasive.[20]

---

dependent on him, to handle trade secret information as well as to procure new client relationships and maintain existing ones. Huber has not at any point contended that he did not owe AFS a fiduciary duty of loyalty.

[20] Vann and Livingston also contend that the record does not support punitive damages because the District Court found that they did not act with malice or intent to harm with respect to AFS's trade secret misappropriation claim. That argument misses the mark because it ignores that AFS's trade

30

We also have little difficulty rejecting Vann's and Livingston's assertion that the District Court improperly awarded punitive damages against them because of their lack of remorse for their misconduct. To the extent the District Court considered Vann's and Livingston's contrition (or, more precisely, the total absence thereof) for their actions in determining whether their conduct warranted the imposition of punitive damages, it is clear that the Court did so only to the extent it was suggestive of their state of mind at the time of their wrongdoing. There was no error in considering Vann's and Livingston's attitude for that purpose. *See In re Lemington Home for the Aged*, 777 F.3d 620, 635 (3d Cir. 2015) (upholding award of punitive damages where defendants' "state of mind was illuminated by their own testimony at

---

secret misappropriation claim and its claim for aiding and abetting a breach of fiduciary duty were separate and distinct causes of action. The District Court correctly explained that "AFS's substantive claims targeted different—albeit, at times, overlapping—conduct. In deciding whether to award enhanced damages, and in what amount, we examined different aggravating conduct under each claim. The distinction, in our view, lies in defendants' states of mind and the nature of their actions. Defendants' misappropriative conduct, while knowing and unlawful under the statute, might fairly be characterized (with limited exceptions) as passive and acquiescent. Their tortious conduct, *per contra*, was active, deliberate, and willful; it endured without pause for the better part of a year; and the defendants to date fail to appreciate the gravity of their wrongdoing." *Post-Judgment Op.*, 381 F. Supp. 3d at 391. On appeal, Vann and Livingston fail to rebut the District Court's persuasive rejection of their position.

31

trial[,]" which testimony allowed "the jury to infer that they had acted culpably and continued to avoid recognizing the gravity of their misconduct").

## D. Set-off of Orbital Settlement[21]

Next, all Appellants argue that the District Court improperly failed to set-off the value of AFS's settlement with Orbital from the compensatory damages it awarded to AFS, as purportedly mandated by the Pennsylvania Uniform Contribution Among Tortfeasors Act ("PUCATA"). According to Appellants, they are entitled to a set-off under PUCATA because Orbital was a joint-tortfeasor. The District Court held that Appellants had failed to put either AFS or the Court on notice that a "setoff theory was fair game at trial[.]" *Post-Judgment Op.*, 381 F. Supp. 3d at 383. We agree.

The Huber Parties carry the ball for the Appellants on this issue and assert that it is not forfeited, for four reasons: (i) they were not required to file a formal pleading requesting set-off; (ii) AFS was on notice that Appellants would seek set-off of the Orbital settlement; (iii) Orbital's status as a joint tortfeasor was tried by the parties' implied consent; and (iv) Federal Rule of Civil Procedure 52(a)(5) permits them to, for

---

[21] The District Court held that Appellants failed to provide fair notice to AFS that they would be seeking setoff with respect to the Orbital settlement. "We review a District Court's decision as to the waiver of an affirmative defense for abuse of discretion." *In re Asbestos Prods. Liab. Litig. (No. VI)*, 921 F.3d 98, 104 (3d Cir. 2019).

the first time, raise the set-off issue after judgment.[22]  Those arguments, individually and collectively, fail.

As to the first argument, whether or not Appellants were obligated to formally plead set-off under PUCATA is beside the point.  The District Court did not hold that Appellants forfeited their set-off argument solely because they neglected to plead it.  Rather, the Court noted the Appellants' complete failure to raise the issue at any point in the litigation, up to and including trial.  Appellants cite no case in which a party seeking to set off the amount of a co-defendant's settlement against a damages award did not plead, attempt to plead, or otherwise squarely raise that issue before judgment was rendered.

As shown by cases on which Appellants themselves rely, the party invoking PUCATA must provide some clear indication that, even if it did not plead the set-off, it actually raised the issue in some fashion.  *See Kilbride Invs. Ltd. v. Cushman & Wakefield of Pennsylvania, Inc.*, Civil Action No. 13-5195, 2019 WL 3713878, *6–7  (E.D. Pa. Aug. 6, 2019) (denying the plaintiff's pre-trial motion to voluntarily dismiss a defendant where co-defendant objected on the grounds that dismissal would inhibit its ability to claim an "offset" from the to-be-dismissed defendant where issue of joint tortfeasor status had "been an actively debated issue for well over a year," and the court had previously "ordered briefing on the narrow issue of joint tortfeasor status between the then-remaining

---

[22] The Livingston Parties do not address in their briefing the question of whether they forfeited this issue before the District Court by failing to raise it before judgment was entered.

33

defendants"); *Nat'l Liberty Life Ins. Co. v. Kling P'ship*, 504 A.2d 1273, 1277–78 (Pa. Super. Ct. 1986) (denying pre-trial motion specifically raising issue of contribution and indemnity from settling co-defendants).[23]

Second, the contention that Appellants did not waive the set-off issue because "AFS was on adequate and early notice that [Appellants] would seek a set-off of the Orbital settlement agreement[,]" is belied by the record and Appellants' conduct. Huber Parties Opening Br. at 40. None of the examples cherry-picked by Appellants from the voluminous record makes any mention of either set-off or joint-tortfeasor liability. To the extent those examples speak to anything beyond the undisputed fact that AFS reached a settlement with Orbital and that Orbital was dismissed from this case, we agree with the District Court that they suggest only that Appellants sought to use the settlement agreement to impugn the objectivity and credibility of testimony and other evidence provided by Orbital sources.[24] Significantly, the Huber Parties' briefing has no

---

[23] Appellants' reliance on *Mazer v. Lipshutz*, 360 F.2d 275 (3d Cir. 1966), is likewise misplaced. The release at issue in that case, although not pled, nevertheless was considered on appeal because the release had been admitted into evidence in two different, consecutive trials involving the parties, without objection. *Id.* at 277.

[24] *See* Livingston Parties' Statement of Facts and Conclusions of Law (ECF 247-2) at ¶¶ 142–43 (noting that AFS dismissed Orbital from suit after settling and arguing the settlement consideration should not be considered evidence of AFS's competence to perform work); Huber Parties' Trial Exhibit List (ECF 295) at 7 (identifying settlement agreement

explanation as to why, if set-off was truly an issue before the District Court, not a single defendant murmured a negative word about Orbital's dismissal from the case, despite those co-defendants having the burden of proving that Orbital was a joint-tortfeasor.[25]  In belatedly raising the issue for the first

---

and release as exhibit); App. at 2221–40 (copies of the settlement agreement and related AFS/Orbital commercial agreement); App. at 2800–01 (trial testimony of Orbital employee pertaining to cooperation provision in AFS/Orbital settlement agreement); App. at 3015–16 (trial testimony of AFS employee regarding profitability of contract with Orbital resulting from settlement); App. at 4726 (Huber Parties' requested finding of facts and conclusions of law highlighting cooperating provision in AFS's settlement agreement with Orbital); App. at 4762 (same); App. at 5777–78 (noting that AFS dismissed Orbital from suit after settling and emphasizing Orbital promised in settlement agreement to cooperate with AFS in AFS's pursuit of its claims against the other defendants in this case).

[25] *See Montgomery Cty. v. Microvote Corp.,* 320 F.3d 440, 450 (3d Cir. 2003) (holding defendants waived their Rule 60(b) claim to set-off plaintiff's settlement with purported joint-tortfeasor where, inter alia, "[defendants] did not attempt to keep [the settling defendant] in the case in order to apportion liability, nor did they request substitution of a settlement that delineated [the settling defendant]'s pro-rata share of liability" and "the settlement did not mention the non-settling defendants' liability"); *Rocco v. Johns-Manville Corp.*, 754 F.2d 110, 115 (3d Cir. 1985) ("One would have expected the nonsettling defendants to either have requested substitution of [releases in which the plaintiff agrees to a *pro rata* reduction

time after trial and judgment, Appellants, without justification, unreasonably deprived AFS of a fair opportunity to address it at trial or any time prior thereto.

For largely the same reasons, the assertion that the issue of set-off was tried by the parties' "implied consent" necessarily fails. "[I]mplied consent depends on three factors: 'whether the parties recognized that the unpleaded issue entered the case at trial, whether the evidence that supports the unpleaded issue was introduced at trial without objection, and whether a finding of trial by consent prejudiced the opposing party's opportunity to respond.'" *Liberty Lincoln-Mercury, Inc. v. Ford Motor Co.*, 676 F.3d 318, 327 (3d Cir. 2012) (quoting *Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir.1995)). At a minimum, Appellants cannot satisfy the first or third criteria because the record shows that neither AFS nor the District Court was aware that set-off was an issue at trial, and that lack of awareness unfairly deprived AFS of an opportunity to present evidence on the issue of whether Orbital and Appellants were joint-tortfeasors. *See Post-Judgment Op.*, 381 F. Supp. 3d at 383 ("[N]o defendant ever so much as hinted that the isolated evidence on which they now rely–the AFS-Orbital settlement agreement, AFS's initial verified complaint in this case, and an isolated passage … [of] trial testimony–was introduced for the purpose of establishing Orbital as a joint tortfeasor.").

---

equal to the settlement amount from any judgment awarded against nonsettling defendants] or judicial determination of liability. The nonsettling defendants took no action, apparently acquiescing in the settling part[y's] absence from the trial. That failure to act may be considered a waiver of any benefit from the [settling defendant's release] or the amounts paid for [it].").

Finally, there is no merit in the contention that Federal Rule of Civil Procedure 52(a)(5) somehow excuses Appellants' complete failure to raise the set-off issue before judgment was entered. Rule 52(a)(5) allows a party to "question the sufficiency of the evidence supporting" a finding of fact that a district court actually makes. Fed. R. Civ. P. 52(a)(5). The Court did not make any relevant findings regarding set-off, including whether Orbital was a joint-tortfeasor. And that, undoubtedly, was because the issue was never raised.

Rule 52(a)(5) does not, as the Huber Parties necessarily argue, contemplate new or additional findings of fact, nor does it sanction the injection of an entirely new and previously unintroduced legal theory into proceedings. The Huber Parties cite no authority that would sustain their novel construction of Rule 52(a)(5), and we reject it, as it runs contrary both to the plain language of the rule and to the general notions of fairness, equity, and finality in dispute resolution that pervade the Federal Rules of Civil Procedure. Accordingly, the District Court did not err in excluding the Orbital settlement from its compensatory damages calculation.

### E. Lost Profit Damages Calculation[26]

Finally, the Huber Parties challenge the District Court's calculation of the lost profits awarded to AFS as damages for

---

[26] The Huber Parties challenge the District Court's factual determination that certain costs should be excluded from its lost profits damages award. We review that factual determination for clear error. *VICI Racing*, 763 F.3d at 293.

the trade secrets misappropriation. The Court's damages figure was based in part on the terms of a contract that Orbital awarded to INSYSMA instead of AFS. The Huber Parties contend that the Court erred as a factual matter in failing to account for approximately $470,000 in costs contemplated by the contract when determining AFS's lost profits. That argument too fails.

Although the Orbital-INSYSMA contract may have contemplated that INSYSMA would undertake certain work that Huber testified would have cost INSYSMA approximately $470,000, there is ample evidence that Huber himself did not believe the work in question was actually encompassed by and a part of the contract. Moreover, it is undisputed that INSYSMA never performed that work. AFS, not INSYSMA, completed it, and that occurred only after Orbital had to sue INSYSMA because INSYSMA initially refused to deliver the underlying materials for the work.

The District Court's lost profits analysis ultimately rested on the amount INSYSMA actually was paid under the contract for the work it actually performed. The Huber Parties are not entitled to a reduction in damages for expenses they never incurred and apparently were not obligated to incur.

## III.  CONCLUSION

For the foregoing reasons, we will affirm the rulings and judgment of the District Court.